CORRECTED

# In the United States Court of Federal Claims

No. 21-1079C

(Filed Under Seal:  October 21, 2021)
(Filed:  October 28, 2021)

| | |
|---|---|
| **AERO SPRAY, INC. d/b/a DAUNTLESS AIR,** | ) ) ) |
| *Plaintiff,* | ) ) ) |
| v. | ) ) |
| **THE UNITED STATES,** | ) ) ) |
| *Defendant,* | ) ) ) |
| and | ) ) |
| **HENRY'S AERIAL SERVICE, INC., and FLETCHER FLYING SERVICE, INC.** | ) ) ) ) ) |
| *Defendant-Intervenors.* | ) ) ) |

*Lee Dougherty*, Effectus PLLC, Washington, D.C., for Plaintiff.

*Albert S. Iarossi*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  With him on the briefs were *Brian M. Boynton*, Acting Assistant Attorney General, Civil Division, *Martin F. Hockey, Jr.*, Acting Director, and *Douglas K. Mickle*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel was *Alexander W. Fichtel*, United States Department of Interior, Office of the Solicitor, Rocky Mountain Region, Lakewood, CO.

*Brian G. Walsh*, Wiley Rein LLP, Washington, D.C., for Defendant-Intervenor, Henry's Aerial Service, Inc.  With him on the briefs were *Craig Smith* and *Cara L. Lasley*.

*Leonard Collins*, GrayRobinson, P.A., Tallahassee, FL, for Defendant-Intervenor, Fletcher Flying Service, Inc.  With him on the briefs was *Allison Goodson*.

## OPINION AND ORDER[*]

*SOLOMSON*, **Judge.**

Since 1947, Smokey Bear has taught the American public to "Remember…Only YOU Can Prevent Forest Fires."[1] Unfortunately, wildfires remain a major problem in the United States.[2] The federal government is responsible for responding to wildfires that occur in the approximately 600 million acres of federal lands,[3] and procures a variety of resources to confront this daunting task—including, as relevant here, amphibious water scooping fixed-wing aircraft services for firefighting.

In this post-award bid protest, Plaintiff, Aero Spray, Inc. d/b/a Dauntless Air ("Aero Spray"), an awardee of a multiple award indefinite delivery indefinite quantity ("IDIQ") contract for the aforementioned firefighting services, challenges the decision of Defendant, the United States, acting by and through the Department of the Interior ("DOI" or the "Agency"), to also award IDIQ contracts to Defendant-Intervenors, Henry's Aerial Service, Inc. ("Henry's Aerial") and Fletcher Flying Service, Inc. ("Fletcher Flying").[4] Aero Spray contests the other contract awards to Henry's Aerial and Fletcher Flying as arbitrary, capricious, and otherwise not in accordance with law and seeks a permanent injunction preventing DOI from proceeding with them. The government and Defendant-Intervenors moved to dismiss Aero Spray's complaint for lack of standing and because the action is untimely pursuant to the *Blue & Gold* waiver

---

[*] On October 21, 2021, the Court filed, under seal, this opinion and order and provided the parties the opportunity to propose redactions. On October 28, 2021, the parties filed joint proposed redactions, ECF No. 53, which this Court adopts, in full, and accordingly reissues this public version of this opinion and order. Redacted information is noted with [ * * * ].

[1] *About the Campaign*, Smokey Bear, https://smokeybear.com/en/smokeys-history/about-the-campaign (last visited Aug. 19, 2021); *see also* Pub. L. No. 93-318, 88 Stat. 244 (codified at 16 U.S.C. §§ 580p *et seq.*).

[2] Katie Hoover & Laura A. Hanson, Cong. Rsch. Serv., IF 10244, Wildfire Statistics 1–2 (2021) ("From 2011 to 2020, there were an average of 62,805 wildfires annually and an average of 7.5 million acres impacted annually. . . . Most wildfires are human-caused (88% on average from 2016 to 2020) . . . .").

[3] *Id.* at 1 ("[T]he U.S. Department of Agriculture . . . carries out wildfire management and response across 193 million acres of the National Forest System . . . [and t]he Department of the Interior . . . manages wildfire response for more than 400 million acres of national parks, wildlife refuges and preserves, other public lands, and Indian reservations.").

[4] Fletcher Flying Service, Inc. appears to have changed its name to Coastal Air Strike in mid-2021. *Fletcher Flying Service Rebrands to Coastal Air Strike*, Coastal Air Strike (Aug. 11, 2021), https://coastalairstrike.com/fletcher-flying-service-rebrands-to-coastal-air-strike/. Because the parties refer only to Fletcher Flying, this opinion will do the same.

rule.  The parties also filed motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC").

For the reasons explained below, the Court **GRANTS** the government's and Defendant-Intervenors' respective motions to dismiss.  The Court **DENIES** Aero Spray's motion for judgment on the administrative record.  Finally, the Court **DENIES** as **MOOT** the pending motions to supplement the administrative record.

# I.   FACTUAL AND PROCEDURAL BACKGROUND[5]

## A.  The Solicitation

To assist with fighting wildfires, DOI has a need to "acquire single engine amphibious water scooping fixed-wing aircraft services for the Bureau of Land Management (BLM) and other federal and state agencies[.]"  AR 27; *see also* AR 1.  DOI specifically sought to acquire "FireBoss" aircraft services "to support fire suppression, water scooping, and fire-retardant delivery operations" for "areas otherwise difficult to access."  AR 10–11.  A FireBoss aircraft is typically a single engine aircraft modified and outfitted with specialized equipment, including amphibious float and scooper packages.  AR 1, 5.

Aero Spray and Air Spray USA, Inc. ("Air Spray") performed the predecessor contracts to those at issue here.  AR 11.  With those contracts scheduled to expire on April 30, 2021,[6] DOI issued, on October 22, 2020, Solicitation No. 140D8020R0019, as a Request for Proposals (the "Solicitation" or the "RFP") to procure the services of "a combined fleet of *approximately* 20–24 [FireBoss] aircraft."  AR 10, 23 (emphasis added).  The RFP is an unrestricted acquisition, providing for multiple award IDIQ contracts, with an order ceiling of $46,000,000.  AR 10; *see also* AR 16 ("The Government intends to award multiple contracts.").

---

[5] This background section constitutes the Court's findings of fact drawn from the administrative record.  Judgment on the administrative record, pursuant to RCFC 52.1, "is properly understood as intending to provide for an expedited trial on the record" and requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354, 1356 (Fed. Cir. 2005).  Citations to the administrative record (ECF No. 21) are denoted as "AR," followed by the page number.

[6] These contracts allowed for a six-month extension "in the event of unforeseen delays (such as a protest)."  AR 10.

Following a series of RFP amendments, including a question-and-answer document ("Q&As"), the Agency issued a revised, conformed Solicitation on December 16, 2020.  AR 330 (RFP Amendment 0006); AR 332-431 (revised Solicitation).

The RFP provided for a one-year base period, and four single-year option periods.  AR 1, AR 337–339.  Proposals were initially due November 23, 2020, but DOI subsequently extended the closing date to December 23, 2020.  AR 23, 330, 955, 1375–76.

Pursuant to the RFP, the Agency was required to "evaluate all acceptable offers based on the [following] evaluation factors[:]" (1) Technical Capability; (2) Organizational Safety; (3) Past Performance; and (4) Evaluated Price.  AR 412 (RFP § D8.1 ("Evaluation Factors")).  As relevant here, the RFP provided that offerors "must propose an aircraft that meets or exceeds the Minimum Aircraft Requirements specification in Section A of this solicitation" and that an "offer will be rated Unsatisfactory if the aircraft proposed fails to meet any of the Minimum Aircraft Requirements specified in Section A of this solicitation."  AR 412 (RFP § D8.2 ("Technical Capability")).

The RFP also provided that the government will place orders for services via "task order request[s] for proposal[s]" — known as TORPs — which would be issued to contract holders.  AR 375 (RFP § C15.1.1).  While awarded contracts would permit discounted pricing, "[c]ontractors' pricing for task orders shall not exceed the prices in the IDIQ price schedule."  *Id.*  On the other hand, the RFP cautioned that "[d]ue to the nature of firefighting, urgent orders are likely" where "[p]ursuant to FAR 16.505(b)(2), fair opportunity need not be provided . . . ."  AR 375 (RFP § C15.1.2).  "In such cases, the ordering activity will select the contractor it deems to offer the best value to the Government[,] . . . [but] [b]ecause urgent orders may be issued under the IDIQ without the opportunity to submit a task order proposal with revised pricing, offerors are encouraged to include their best pricing in their IDIQ price proposals."  *Id.*

Finally, the RFP provided for the onboarding of additional contractors after the initial contract awards, as follows:

> The Government reserves the right to announce a new competition (Onboarding) for the purpose of adding additional multiple award, indefinite delivery, indefinite quantity (IDIQ) contract holders.  Onboarding procedures may be implemented at any time over the life of the contract (five years from the date of initial award) by reopening the competition and utilizing the same basis of award established in the original solicitation 140D8020R0019.  Bureau customers

> will initiate the need for additional contract holders by contacting the CO.  The CO will then assess the need for additional support or whether current contract holders can satisfy the need.  Should additional support be required, the CO will publicize a notice by modifying the original solicitation, and complete a new source selection.  Contracts awarded through these Onboarding Procedures will include the same terms and conditions as those in the basic contract.  Neither the overall period of performance nor the ceiling of the basic contract will be revised as a result of implementing the Onboarding procedures.

AR 380 (§ C27).

## B.  The Question-and-Answer Amendment to the Solicitation

DOI provided offerors with an opportunity to submit questions to the Agency to attempt to clarify any ambiguities in, or to raise other issues with, the RFP.  AR 121.

On November 13, 2020, DOI published the resulting Q&As as an amendment to the RFP, including the following pertinent exchanges:

> Question 2) We are in the midst of adding two Fire Bosses to the fleet. They will both be completed by year end. One very well may be completed and have a Weight and Balance and MEL done by the submission date for the Solicitation. We own the aircraft, we own the floats, gates and avionics. We may just not have all of it put together for a final Weight & Balance by 11/23. In that case, how should we handle listing the aircraft?

> Answer 2) As per Section B32.1, referenced by D4.11.1.2, provide a weight and balance *for each proposed aircraft* with the aircraft in contract configuration. The proposal must include *at least one aircraft that meets the minimum requirements of this solicitation*. Section C17 is added to the Solicitation to define procedures for adding aircraft after initial award(s). Also see Exhibit 16 Add/Remove Aircraft/Equipment Request Form.

> \* \* \* \*

Question 3) Section A1 states the Aircraft Configuration required for listing in response to the Solicitation. For a Contractor to offer an aircraft in response to this solicitation, does the aircraft need to be in operational Fire Boss contract configuration, including an acceptable Weight & Balance (in accordance with Section B32) and Equipment List that would allow the Aircraft Questionnaire to be filled out?

Answer 3) A proposal must include at least one aircraft that meets the minimum requirements of Section A1, and all related requirements and documentation as stated in the solicitation, to include a current weight & balance report, Exhibit E-2 and Exhibit E-3. Additional aircraft may be offered after initial award as detailed in Question 2. See Question 2 for adding aircraft after initial award(s), and see Exhibit 16 Add/Remove Aircraft/Equipment Request Form.

* * * *

Question 26) Exhibit E-2:  Can a vendor include an aircraft in its offer that will not be delivered to that vendor in Fire Boss configuration until after the solicitation closes? Would it be acceptable for the vendor to base its empty weight and payload calculations on an aircraft in wheel configuration with estimates on what the Fire Boss will weigh after installation of avionics, a fire gate, and Wipaire floats and accessories (Accurate W&B; Equipment List; and performance calculations would not be completed until after aircraft delivery in Fire Boss configuration)?

Answer 26) See Questions 2 & 3.

AR 121–23, 127 (emphasis added).

## C. Proposals, Evaluations, and Contract Awards

Four offerors submitted timely proposals:  Aero Spray; Air Spray; Henry's Aerial; and Fletcher Flying.  AR 1364.  As part of their respective proposals, Aero Spray proposed fifteen FireBoss aircraft, Air Spray proposed five, Henry's Aerial proposed four, and Fletcher Flying proposed two.  AR 1365–71.

Two of Aero Spray's proposed aircraft were "new aircraft and currently at the factory[.]" AR 1365. Although the Source Selection Evaluation Board ("SSEB") found certain deficiencies with those aircraft, the SSEB assessed them as "relatively minor" in terms of the company's "ability to complete in a timely manner prior to contract inspection/performance." *Id.* The SSEB also noted that Aero Spray "provided sufficient information within the proposal to ensure the aircraft will be delivered in short time frame, and aircraft will meet contract specifications at time of inspection." *Id.* (noting with respect to one aircraft that "floats [are] not installed" and that another's "fire gate/tank [are] not currently installed"). All of Aero Spray's proposed aircraft were recommended for award. *Id.*

Both of Fletcher Flying's proposed aircraft similarly had "no floats currently installed." AR 1369. Consistent with the SSEB's determination regarding Aero Spray's two deficient aircraft, the SSEB concluded that Fletcher Flying's "offered aircraft . . . have been determined acceptable." *Id.* Once again, the SSEB explained that "[a]lthough floats are not currently installed, this was considered to be relatively minor regarding the [company's] ability to complete in a timely manner prior to contract inspection/performance and addressed [in the] offeror's proposal." *Id.* ("Sufficient information was provided by the offeror that the aircraft will meet or exceed the standards, therefore deemed acceptable and recommend for award.").

The four aircraft Henry's Aerial proposed likewise were "not currently configured on floats, and have equipment install and/or alterations left to be done." AR 1371. Just as the SSEB had determined for Aero Spray and Fletcher Flying, the SSEB concluded that the issues with Henry's Aerial proposed aircraft were "relatively minor regarding the [company's] ability to complete in a timely manner prior to contract inspection/performance" and that "[t]here is sufficient information within the proposal to ensure the aircraft will be delivered in a short time frame, and that all aircraft will meet or exceed the standards." *Id.* "Therefore the SSEB deemed these aircraft acceptable and recommend these aircraft for award." *Id.*

In sum, the SSEB's recommendation was "to AWARD TO ALL OFFERORS." AR 1373. The Agency's final award decisions reflect the above SSEB findings. AR 1378 (Aero Spray evaluation summary, noting that "two of the aircraft require minor equipment items to be installed prior to inspection, carding, and performance under this contract" and that "[t]he offeror provided sufficient information in the proposal to properly evaluate these two aircraft"); AR 1378 (Fletcher evaluation summary, noting that "both aircraft require minor equipment items to be installed prior to inspection, carding, and performance under this contract[,]" that "[s]ufficient information was provided in the proposal to properly evaluate these two aircraft[,]" and that "[t]he technical evaluators confirmed that installation of the floats and other minor equipment

items are typical in the industry and fully expect the offeror to complete the configuration in time for performance"); AR 1379 (Henry's Aerial evaluation summary, making similar findings, and noting that "[t]he offeror provided sufficient information in the proposal to properly evaluate all four aircraft" and that because "all four aircraft met or exceeded the minimum requirements, [t]he SSEB determined all four aircraft as Acceptable").

With respect to pricing, the Agency determined that "the strong competition in an acceptable range among the offers validates the pricing as reasonable." AR 1384. The Agency recognized that Fletcher Flying and Henry's Aerial both "indicated [an] intention to offer [ * * * ] with [ * * * ] since they're coming into the amphibious scooping specialty of the SEAT [ * * * ], hoping to earn ample volumes of service opportunities and build strong past performance for a prospective and beneficial future." *Id.*[7]

In sum, the Agency concluded:

> Proposals from Aero Spray — Dauntless, Air Spray, Fletcher Flying, and Henry's Aerial consisting of a combined total of 26 offered aircraft met or exceeded the minimum requirements stated in the solicitation for all three non-priced factors. Eight of the 26 aircraft need to be final-configured for service prior to inspection, carding, and performance on resultant contracts. The SSEB has high confidence all offered aircraft will be complete and configured to contract specification in time for contract performance. Pricing for all offerors is determined fair and reasonable. . . .

AR 1385.

## D. Procedural History

On March 18, 2021, Aero Spray filed its initial complaint against the United States in this Court, ECF No. 1, and amended its complaint on April 2, 2021. ECF No. 20 ("Am. Compl."). In the amended complaint, Aero Spray alleges that the Agency awarded IDIQ contracts to Henry's Aerial and Fletcher Flying despite the fact that neither proposed FireBoss aircrafts compliant with the RFP's putative "in contract configuration" requirement at the time of proposal submission. Am. Compl. ¶¶ 10–13, 36–37, 50. Aero Spray contends that while it "spent significant funds" to comply with

---

[7] SEAT stands for "Single Engine Air Tanker."  AR 334 (Contract Acronyms).

this alleged requirement, Henry's Aerial and Fletcher Flying were able to "decrease[] the total cost of their offers" by ignoring it. *Id.* ¶¶ 62, 63.

On April 9, 2021, the government filed the administrative record ("AR") in this matter. ECF No. 21. On May 11, 2021, Aero Spray filed its motion for judgment on the administrative record. ECF No. 34 ("Pl. MJAR"). On that same day, the government and Defendant-Intervenors, Henry's Aerial and Fletcher Flying, each filed their respective motion to dismiss or, in the alternative, a motion for judgment on the administrative record. ECF Nos. 31 ("Henry's MJAR"), 32 ("Fletcher MJAR"), 33 ("Def. MJAR"). The parties filed timely response briefs. ECF Nos. 37 ("Henry's Resp."), 38 ("Def. Resp."), 39 ("Fletcher Resp."), 40 ("Pl. Resp."). On June 17, 2021, the Court held oral argument. ECF Nos. 36, 47 ("Tr.").

Following oral argument, the Court directed the government to produce an affidavit from the cognizant contracting officer regarding the status of Defendant-Intervenors' proposed aircrafts and provided the parties an opportunity to file motions to supplement the administrative record with relevant information regarding their proposed aircrafts. ECF No. 42. The parties filed their respective supplemental briefs. ECF Nos. 44 ("Henry's Supp. Br."), 45 ("Pl. Supp. Br."), 49 ("Def. Supp. Br."). Both Henry's Aerial and Aero Spray moved to supplement the record; the government opposes Aero Spray's motion. Def. Supp. Br. at 4.

## II.   AERO SPRAY LACKS STANDING TO PROTEST THE CONTRACT AWARDS MADE TO DEFENDANT-INTERVENORS

A threshold issue in this case is whether Aero Spray, as an awardee of one of the multiple award IDIQ contracts, has standing to challenge DOI's additional contract awards to Henry's Aerial and Fletcher Flying. *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue."). "The party invoking federal jurisdiction bears the burden of establishing standing." *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (citing *Myers*, 275 F.3d at 1369). Where a plaintiff lacks standing, its case must be dismissed pursuant to RCFC 12(b)(1). *Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003) ("Because standing is jurisdictional, lack of standing precludes a ruling on the merits."). The government and Defendant-Intervenors argue that Aero Spray, having received a contract award, lacks standing to challenge the separate awards to its competitors. *See* Def. MJAR at 19–28; Henry's MJAR at 18–21; Fletcher MJAR at 24–31. The Court agrees — at least given the facts of this case — but the underlying issue is far from simple.

## A. General Article III Standing Principles

"We begin with the most basic doctrinal principles: Article III, § 2, of the Constitution restricts the federal 'judicial Power' to the resolution of 'Cases' and 'Controversies.' That case-or-controversy requirement is satisfied only where a plaintiff has standing." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008); *see Dep't of Com. v. New York*, -- U.S. --, 139 S. Ct. 2551, 2565 (2019) ("For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue."); *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1263–64 (Fed. Cir. 2010) ("Article III, § 2 of the Constitution limits the jurisdiction of federal courts to 'Cases' or 'Controversies.' The doctrine of constitutional standing serves to identify which disputes fall within these broad categories and therefore may be resolved by a federal court.").[8]

The United States Supreme Court has "established that the 'irreducible constitutional minimum' of standing consists of three elements[,]" including that the plaintiff allege facts demonstrating that it: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). As noted above, a plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990). Injury in fact is a constitutional requirement, and "[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997), *quoted in Spokeo*, 578 U.S. at 339. To establish injury in fact, a plaintiff must show that it suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "'actual or imminent, not conjectural or hypothetical.'" *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).[9] Thus, "Article III standing requires a

---

[8] "Our cases involving non-Article III tribunals have held that these courts exercise the judicial power of the United States." *Freytag v. Comm'r*, 501 U.S. 868, 889 (1991). "The Court of Federal Claims, though an Article I court, 28 U.S.C. § 171 (2000), applies the same standing requirements enforced by other federal courts created under Article III." *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003); *see also* 28 U.S.C. § 2519 (empowering the Court of Federal Claims to enter final judgments in any "claim, suit, or demand against the United States arising out of the matters involved in the case or controversy").

[9] "The Supreme Court has not defined the term 'legally protected interest' as it pertains to Article III standing, nor has it clarified whether the term does any independent work in the standing analysis." *Cottrell v. Alcon Lab'ys.*, 874 F.3d 154, 163 (3d Cir. 2017); *see also In re Special Grand Jury 89-2*, 450 F.3d 1159, 1172 (10th Cir. 2006) ("The term *legally protected interest* has generated some confusion because the Court has made clear that a plaintiff can have standing

concrete injury even in the context of a statutory violation.  For that reason, [a plaintiff] could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III."  *Spokeo*, 578 U.S. at 341.[10]

Congress may enact statutes that provide would-be plaintiffs with standing subject only to the constraints of Article III itself; alternatively, Congress may impose heightened standing requirements.  *See, e.g.*, *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177 (2011) (concluding that statutory term granting standing to a "['person] aggrieved' must be construed more narrowly than the outer boundaries of Article III" while rejecting the argument "[a]t the other extreme . . . that 'person aggrieved' . . . is a term of art that refers only to the employee who engaged in the protected activity").[11]

### B.  Administrative Procedure Act ("APA") Standing Principles

The APA[12] provides standing almost to the limits of Article III, as follows:  "[a] person . . . adversely affected or aggrieved by agency action within the meaning of a

---

despite losing on the merits — that is, even though the interest would not be protected by the law in that case.").  In that regard, "[t]he Wright & Miller treatise criticizes the phrase 'legally protected interest' on the ground that it seems to beg the question of the legal validity of the claim and therefore 'provide[s] ample opportunity for mischief' given 'the common tendency to use standing concepts to address the question whether the plaintiff has stated a claim.'" *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 n.3 (10th Cir. 2006) (*en banc*) (quoting 13 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.4 (2d ed. Supp. 2005)); *see also Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1030 (D.C. Cir. 2003) (noting that, on a motion to dismiss, "a plaintiff's *non-frivolous* contention regarding the meaning of a statute must be taken as correct for purposes of standing," lest the court "effectively be deciding the merits under the guise of determining the plaintiff's standing" (emphasis added)); *Claybrook v. Slater*, 111 F.3d 904, 907 (D.C. Cir. 1997) (concluding that only "if the plaintiff's claim has no foundation in law" does the plaintiff have "no legally protected interest and thus no standing to sue").  In any event, "the Supreme Court has repeatedly recognized that financial or economic interests are 'legally protected interests' for the purposes of the standing doctrine."  *Cottrell*, 874 F.3d at 164.

[10] *See also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing.").

[11] *See also WiAV Sols.*, 631 F.3d at 1264–65 (explaining that "[o]ften a statute creates the necessary legally protected interest" and holding that "[b]ecause the Patent Act creates the legally protected interests in dispute, the right to assert infringement of those interests comes from the Act itself"); *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100 (1979) (noting that while "Congress may, by legislation, expand standing to the full extent permitted by Art. III[,] . . . [i]n no event, however, may Congress abrogate the Art. III minima").

[12] Pub. L. No. 79-404, 60 Stat. 237 (codified as amended in scattered sections of 5 U.S.C.).

relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA standing test is not particularly stringent. *See, e.g.*, *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). While the Supreme Court "has long held that a person suing under the APA must satisfy not only Article III's standing requirements," but also must assert an interest "'arguably within the zone of interests to be protected or regulated by the statute'" or regulation allegedly violated, that latter "prudential standing test . . . 'is not meant to be especially demanding.'" *Id.* at 224–25 (first quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970); and then quoting *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987)).[13]

Indeed, the Supreme Court has instructed courts to apply the APA's standing test "in keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'" *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225 (quoting *Clarke*, 479 U.S. at 399, for both that proposition and for the idea that the Court does "not require any 'indication of congressional purpose to benefit the would-be plaintiff'").[14] Thus, the APA's standing "test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225 (quoting *Clarke*, 479 U.S. at 399).[15]

In this case, Aero Spray's alleged injury in fact is the economic harm from increased future competition for individual task orders resulting from the allegedly improper IDIQ contract awards to Defendant-Intervenors. Am. Compl. ¶¶ 12, 14–15. Such future injuries "may suffice [for standing purposes] if the threatened injury is 'certainly impending,' or there is a '"substantial risk"' that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 414 n.5 (2013)), *quoted in Dep't of Com. v. New York*, -- U.S. --, 139 S. Ct. 2551, 2565 (2019); *see also TransUnion LLC v. Ramirez*, -- U.S. --, 141 S. Ct. 2190, 2210 (2021) ("As this Court has recognized, a person exposed to a risk of future harm may

---

[13] *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225 ("[W]e have always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff."); *cf. Bennett v. Spear*, 520 U.S. 154, 163 (1997) ("We have made clear, however, that the breadth of the zone of interests varies according to the provisions of law at issue . . . .").

[14] *See also Dep't of Com. v. New York*, -- U.S. --, 139 S. Ct. 2551, 2567 (2019) ("The [APA] embodies a 'basic presumption of judicial review'" (quoting *Abbott Lab'ys. v. Gardner*, 387 U.S. 136, 140 (1967))).

[15] Importantly, and as discussed *infra*, long before Congress vested this Court with exclusive jurisdiction over the actions defined in 28 U.S.C. § 1491(b), the APA provided standing for plaintiffs to challenge an agency's procurement actions. *See Scanwell Lab'ys., Inc. v. Shaffer*, 424 F.2d 859, 861–73 (D.C. Cir. 1970).

pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." (citing *Clapper*, 568 U.S. at 414 n.5 (2013))).

The United States Court of Appeals for the District of Columbia Circuit has held that alleged harm from increased competition for government research grants — a factual scenario analogous to a procurement competition — can provide both Article III and APA standing.  *Sherley v. Sebelius*, 610 F.3d 69, 72, 74–75 (D.C. Cir. 2010) ("We see no reason any one competing for a governmental benefit should not be able to assert competitor standing when the Government takes a step that benefits his rival and therefore injures him economically.").[16]  Courts have applied similar reasoning in other contexts.  *See, e.g.*, *Washington All. of Tech. Workers v. Dep't of Homeland Sec.*, 892 F.3d 332, 341 (D.C. Cir. 2018) (plaintiff had standing where "injury claimed is exposure to increased competition in the STEM labor market"); *cf. Cooper v. Tex Alcoholic Beverage Comm'n*, 820 F.3d 730, 737–38 (5th Cir. 2016) ("numerous courts have upheld the standing of competitors to challenge official actions that change the amount of competition in an economic actor's market").

The Federal Circuit has followed the D.C. Circuit's "competitor standing" jurisprudence in other contexts, explaining that "[a]lthough the doctrine of 'competitor standing' is not yet well-developed in our Circuit, we note that the D.C. Circuit repeatedly has applied the doctrine to hold that 'parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition.'"  *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1333 (Fed. Cir. 2008) (quoting *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998), citing other D.C. Circuit decisions, and holding that a plaintiff had competitor standing).[17]

## C.  "Interested Party" Standing in Actions Pursuant to 28 U.S.C. § 1491(b)

Aero Spray's action is brought pursuant to 28 U.S.C. § 1491(b).  If the APA standing inquiry governed § 1491(b) actions, this Court would have little trouble finding that Aero Spray has standing to challenge the contract awards to Defendant-

---

[16] *See also Sherley*, 610 F.3d at 74 ("Because the Guidelines have intensified the competition for a share in a fixed amount of money, the plaintiffs will have to invest more time and resources to craft a successful grant application.  That is an actual, here-and-now injury.").

[17] On the other hand, answering the question of whether a particular statutory provision actually "'protect[s] [a] competitive interest' . . . 'goes to the merits' of a plaintiff's claim, not to his Article III standing."  *Sherley*, 610 F.3d at 72 (quoting *Ass'n of Data Processing Serv. Orgs., Inc.*, 397 U.S. at 153 (1970)).

Intervenors.  Whether Aero Spray has standing in this case is complicated, however, by the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870 ("ADRA"), which defines not only this Court's jurisdiction over *what* actions may be brought against the government, but also *who* has standing to pursue them.

The Tucker Act's plain language provides that an "interested party" may file an "action" in this Court "objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract *or* [2] to a proposed award *or* [3] the award of a contract *or* [4] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (emphasis and alterations added); *see Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 84 & n.11 (2020).[18]

Were this Court unconstrained by Federal Circuit precedent, the first step in the standing analysis would be to determine whether the statutory term "interested party" imports the fairly permissive APA standing requirements or defines a more limited plaintiff class.  The interpretive problem, in that regard, is that 28 U.S.C. § 1491(b) "provides no definition of the term 'interested party'" and thus "[i]t is unclear whether section 1491(b)(1) adopts the liberal APA standing requirement set forth in section 702 of the APA or whether it adopts the more restrictive standard set forth in 31 U.S.C. § 3551(2)[,]" which applies in bid protests before the Government Accountability Office ("GAO").  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333–34 (Fed. Cir. 2001).

We do not need to speculate about the answer; for better or worse, binding Federal Circuit precedent has resolved the issue.  In *American Federation of Government Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("*AFGE*"), the Federal Circuit first interpreted the term "interested party" to have the same definition as "interested party" in the Competition in Contracting Act of 1984 ("CICA"), Pub. L. No. 98-369, div. B, tit. VII, § 2701, 98 Stat. 494, 1175 (1984), which governs the bid protest jurisdiction of the GAO, *see* 31 U.S.C. §§ 3551–56.  CICA, in turn, defines the term "interested party" as "[1] an actual or prospective bidder or offeror whose [2] direct economic interest [3] would be affected by [4] the award of the contract or by failure to

---

[18] Section 1491(b) actions are typically referred to as "bid protests."  *Tolliver*, 151 Fed. Cl. at 95-99 ("[A]lthough 'ADRA covers *primarily* pre- and post-award bid protests,' the Federal Circuit in *RAMCOR* explicitly reversed this Court's determination 'that a [plaintiff] could only invoke § 1491(b)(1) jurisdiction by including in its action an attack on the merits of the underlying contract award' or the solicitation." (quoting *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999) (emphasis added))).

award the contract." 31 U.S.C. § 3551(2) (emphasis added). In adopting that definition for the purposes of § 1491(b), the Federal Circuit was "not convinced that Congress . . . intended to confer standing on anyone who might have standing under the APA." *AFGE*, 258 F.3d at 1302 (concluding that while 31 U.S.C. § 3551(2) "by its own terms, applies only to [GAO protests] . . . , the fact that Congress used the same term in § 1491(b) as it did in the CICA suggests that Congress intended the same standing requirements that apply to protests brought under the CICA to apply to actions brought under § 1491(b)(1)").[19]

To properly understand the rationale and ramifications of the Federal Circuit's decision in *AFGE*, some historical context is necessary. Prior to ADRA, the district courts possessed APA jurisdiction over challenges to the procurement process; such jurisdiction is referred to as "*Scanwell* jurisdiction" after the case recognizing it. *See Scanwell Lab'ys., Inc. v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970). The Federal Circuit in *AFGE* acknowledged that part of the difficulty in defining the term "interested party" arises from the fact that while ADRA's legislative history reflects some intent to transfer the jurisdiction over *Scanwell* claims to the Court of Federal Claims, the legislative history does not provide clear guidance as to Congress's understanding of the breadth of the *Scanwell* doctrine. 258 F.3d at 1301. In particular, the legislative history does not demonstrate: (1) whether Congress intended to limit ADRA's coverage to claims "brought by disappointed bidders" challenging the solicitation or award of a federal contract — because such claims constituted "[t]he vast majority of cases brought pursuant to *Scanwell*"; *or* (2) whether Congress "intended to give the Court of Federal Claims jurisdiction over any contract dispute that could be brought under the APA" — because "*Scanwell* itself [wa]s based on the APA." *Id.* The Federal Circuit went with the former, and accordingly "interpret[ed] the references in [ADRA's] legislative history to the '*Scanwell* jurisdiction' of the district courts as references to [their] jurisdiction over bid protest cases brought under the APA *by disappointed bidders*, like the plaintiff in *Scanwell*." *Id.* at 1301–02 (emphasis added).

In other words, notwithstanding that *Scanwell* jurisdiction, in general, was nothing more than a particular instantiation of APA jurisdiction, providing a wide variety of plaintiffs with standing to file suit,[20] the Federal Circuit held that 28 U.S.C.

---

[19] The Court, accordingly, agrees with the government that any "reliance on cases that analyze standing under the APA sheds little light on the question before this Court because the Federal Circuit has already explicitly considered — and rejected — the notion that the Tucker Act and the APA have the same standing requirements." Def. Resp. at 4.

[20] *See Validata Chem. Servs. v. Dep't of Energy*, 169 F. Supp. 3d 69, 85 (D.D.C. 2016) (citing *Bayou State Sec. Servs. v. Dravo Util., Inc.*, 674 F.2d 325, 326–28 (5th Cir. 1982), *Am. Dist. Tel. v. Dep't of Energy*, 555 F. Supp. 1244, 1245–48 (D.D.C. 1983), *Lombard Corp. v. Resor*, 321 F. Supp. 687, 688–91

§ 1491(b) permitted protest-type claims only by a more limited class of injured parties (*i.e.*, "disappointed bidders"). In *Banknote Corp. of America v. United States*, for example, the Federal Circuit explained that while "[u]nder the more liberal APA standard, parties other than actual or prospective bidders might be able to bring suit[,]" the appellate court in *AFGE* "concluded that Congress intended standing under the ADRA to be *limited to disappointed bidders*." 365 F.3d 1345, 1351 (Fed. Cir. 2004) (emphasis added) (discussing *AFGE*, 258 F.3d at 1301-02). Accordingly, "[a] party seeking to establish jurisdiction under § 1491(b)(1) must show that it meets § 1491(b)(1)'s standing requirements, which are 'more stringent' than the standing requirements imposed by Article III of the Constitution." *Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017) (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009)).

CICA's definition of "interested party" naturally begs yet further questions, particularly in the context of 28 U.S.C. § 1491(b). What are the parameters of an "actual or prospective bidder"? How does the definition of "interested party" apply in a pre-award challenge to a solicitation, as compared to in a post-award challenge to the award of a contract? Of particular import in this case, does "interested party" include a contract awardee that nevertheless objects to some other aspect of the government's procurement process? Does the definition need to be adjusted for an action challenging "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," which need not involve an underlying attack on a solicitation or contract award?[21] What constitutes a "direct economic interest"? Finally, what effect did ADRA's sunset provision[22] have on the district courts' *Scanwell* jurisdiction (*i.e.*,

---

(D.D.C. 1970), and noting, for example, that "district courts did entertain challenges by subcontractors to subcontract procurements under the *Scanwell* doctrine prior to enactment of ADRA").

[21] *See supra*, note 18; *see also Validata*, 169 F. Supp. 3d at 77 (citing Matthew H. Solomson & Jeffrey L. Handwerker, *Subcontractor Challenges to Federal Agency Procurement Actions*, 06-3 Briefing Papers 1, 4 (Feb. 2006) (arguing that "*AFGE*'s applicability arguably may be limited to the first two prongs of the Tucker Act . . . particularly in light of *AFGE*'s failure to discuss a *RAMCOR*-type suit")).

[22] At the time ADRA was enacted in 1996, that statute granted the federal district courts and the Court of Federal Claims concurrent jurisdiction over the procurement-related actions described in 28 U.S.C. § 1491(b). That changed, however, in 2001, when ADRA's sunset provision eliminated the jurisdiction of the federal district courts and vested the Court of Federal Claims with exclusive jurisdiction over such cases. *See* Pub. L. No. 104-320, § 12(d), 110 Stat. 3870, 3875 (1996) (codified at 28 U.S.C. § 1491 note).

may non-interested parties with APA standing still maintain procurement-related actions in a district court)?[23]

---

[23] These questions, and perhaps others, fairly call into question whether the Federal Circuit's definition of "interested party" in the Tucker Act, as modified by ADRA, should be revisited by the Federal Circuit *en banc*. In that regard, the United States District Court for the District of Columbia has criticized the Federal Circuit's adoption of CICA's definition of "interested party" because "[t]here is no evidence that Congress intended to leave jurisdiction over these *Scanwell* claims in the federal district courts, while vesting the Court of Federal Claims with exclusive jurisdiction over a narrower subset of *Scanwell* claims." *Validata*, 169 F. Supp. 3d at 85. The district court also noted — correctly, in the undersigned's view — that "any arguable parallel between CICA and ADRA breaks down . . . where the plaintiff's cause of action falls under the [last] prong of ADRA's 'objecting to' test, which does not require that the plaintiff object to a federal contract solicitation or award." *Id.* at 84; *see also id.* at 81–82 (explaining that protest categories recognized in CICA do not "parallel" ADRA's prongs and noting that "[i]f this language were read to apply only to disappointed bidders, it is difficult to imagine what work the 'in connection with' clause would perform beyond the first two prongs of ADRA's 'objecting to' test, which already permit challenges by those 'objecting to' federal contract solicitations or awards."). Only if ADRA "is construed to encompass the full range of APA claims previously pursued under the *Scanwell* doctrine — including claims by a plaintiff who is not a disappointed bidder within the meaning of CICA but who possesses standing under the broader standing rule of § 702 of the APA — the 'in connection with' clause has independent import." *Id.* at 82. Finally, the district court pointed out that the Federal Circuit's adoption of CICA's "interested party" definition undermines the congressional purpose in creating an exclusive, consolidated forum for procurement-related disputes:

> Nor is the Court convinced that the Federal Circuit was correct to adopt the narrower CICA standard . . . . The relevant question is not *whether* Validata can bring suit, but *where* it must do so. ADRA is both jurisdiction-conferring and, by implication, jurisdiction-denying. Thus, by reading the provision narrowly, the Federal Circuit limited the jurisdiction of the Court of Federal Claims but arguably expanded the jurisdiction of the federal district courts across the country. This is because, as discussed above, *Scanwell* recognized that the APA confers standing on any aggrieved person to challenge an unlawful or arbitrary agency action, including in procurement cases. Under one view of ADRA, adopted here, Congress transferred jurisdiction over all APA procurement cases to the Court of Federal Claims, while under the other view, arguably adopted in *AFGE*, Congress transferred jurisdiction only over claims brought by disappointed bidders on federal contracts. Yet, either way, ADRA cannot reasonably be construed to have wholly abolished APA procurement claims that might otherwise have been brought under *Scanwell*. The difference between the two constructions is simply whether jurisdiction over some claims

Following *AFGE*, the Federal Circuit continued to refine its bid protest jurisprudence, definitively resolving some of the foregoing questions.  For example, to satisfy the "direct economic interest" component of the "interested party" definition, the Federal Circuit held that a plaintiff's allegations must demonstrate a particular type of prejudice:  a plaintiff "must establish that it had a *substantial chance of securing the award* in order to establish standing[.]"  *Myers Investigative & Sec. Servs.*, 275 F.3d at 1369–70 (emphasis added) (summarizing earlier decisions); *see also Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("As we said in *Myers*, 'prejudice (or injury) is a necessary element of standing.'" (quoting *Myers*, 275 F.3d at 1370)); *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006) (concluding that to demonstrate "the requisite direct economic interest" a plaintiff "is required to establish that it had a 'substantial chance' of receiving the contract"); *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383 (Fed. Cir. 2012) ("The [standing] question whether a protester 'ha[s] a substantial chance of securing the award,' *Myers*, 275 F.3d at 1370, turns on whether the protester would have had a substantial chance if not for the alleged errors."); *cf. Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996) (providing that the "substantial chance" standard for "competitive prejudice" — on the merits — requires the protesting party to "establish not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract but for that error").  This is the exclusive standard applied in post-award protests and this Court is not aware of, nor do the parties provide an example of, the Federal Circuit's having adopted another formulation in that context.

The Federal Circuit, however, modified that post-award standing test for pre-award cases.  In the typical pre-award case (*e.g.*, challenges to a request for information ("RFI")[24] or to a solicitation's legality), applying the "substantial chance" test makes little or even no sense because an agency is in the early stages of the procurement process and potential offerors have not even submitted proposals yet.  In *Weeks Marine,*

---

remains in the district courts or whether all such claims must now be brought in the Court of Federal Claims.

*Id.* at 84 (internal citations omitted); *see also SEKRI, Inc. v. United States*, 152 Fed. Cl. 742, 750 (2021) (suggesting that "[d]espite not being an actual or prospective bidder, SEKRI may have legal resource beyond this court's jurisdiction" and citing *Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 910–11 (10th Cir. 2004), which held that the district courts retain jurisdiction "to hear cases challenging the government's contract procurement process so long as the case is brought by someone other than the actual or potential bidder").

[24] *See, e.g.*, *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1346 (Fed. Cir. 2008) (holding that the government's use of "an RFI to solicit information from outside vendors . . . to determine the scope of services required by the government" constitutes a pre-procurement decision subject to protest because 28 U.S.C. § 1491(b) "does not require an actual procurement").

*Inc. v. United States*, 575 F.3d 1352 (Fed. Cir. 2009), for example, the government historically had awarded certain contracts using competitive sealed bidding procedures but then changed its procurement method to a negotiated IDIQ procurement for the new contracts. *Id.* at 1355–56. A prospective offeror filed an action in this Court, challenging the agency's use of the new approach. *Id.* On appeal, the Federal Circuit addressed the plaintiff's standing:

> We have not had occasion to discuss what is required to prove an economic interest, and thus prejudice, in a case such as this, where a prospective bidder/offeror is challenging a solicitation in the pre-award context. In such a case, it is difficult for a prospective bidder/offeror to make the showing of prejudice that we have required in post-award bid protest cases. *See, e.g., Statistica,* 102 F.3d at 1582 (holding that a contractor lacked standing because it failed to show a "substantial chance it would have received the contract award but for" agency error). The reason of course is that, in a case such as this, there have been neither bids/offers, nor a contract award. Hence, there is no factual foundation for a "but for" prejudice analysis. However, Article III considerations require a party such as Weeks to make a showing of *some* prejudice.

*Weeks Marine*, 575 F.3d at 1361 (some citations omitted). In attempting to "strike[] the appropriate balance between the language of § 1491(b)(1) . . . and Article III standing[,]" the Federal Circuit concluded that it is sufficient for a pre-award protestor merely to allege a "non-trivial competitive injury which can be addressed by judicial relief." *Id.* at 1362. This language is best understood as simply carving out a narrow exception to the general "substantial chance" standard applicable in post-award cases, rather than as creating a new standard. That is because the primary point of *Weeks Marine* was to define more precisely the proper standing inquiry in pre-award cases, and, in particular, to avoid any tension with the *Blue & Gold* waiver rule.[25]

---

[25] In *Blue & Gold Fleet, L.P. v. United States*, the Federal Circuit held that a plaintiff waives a solicitation challenge if the plaintiff could have raised an objection prior to the due date for proposals but only files a protest after the contract award. 492 F.3d 1308, 1313 (Fed. Cir. 2007). Considering that waiver rule, the Federal Circuit in *Weeks Marine* recognized that it "would be anomalous" were the court "to hold that Weeks cannot now challenge the . . . solicitation in the Court of Federal Claims" because "we effectively would be saying that this court has set up a judicial scheme whereby a party runs afoul of the waiver rule if it waits to challenge a solicitation (as Blue & Gold did), but is properly dismissed on standing grounds if it raises the

We cannot lose sight of what the Federal Circuit was trying to "balance." *Weeks Marine*, 575 F.3d at 1362. The issue was that, on the one hand, the Federal Circuit already had concluded that CICA's "interested party" definition imposed a substantially higher burden than Article III to demonstrate prejudice for the purposes of satisfying the "direct economic interest" requirement. Because a "but for" test is unworkable in a pre-award suit, the Federal Circuit nudged the test closer to Article III. But, there is no indication in that decision or any other Federal Circuit decision that allegations demonstrating a cognizable injury in fact for purposes of Article III should be permitted to overwhelm, or somehow substitute for, the requirement for a proper plaintiff to be an "actual or prospective bidder." In other words, the type of cognizable economic prejudice remained that which belongs in the category of "disappointed bidder" pursuant to *AFGE*; that is, a party whose stake in winning the procurement has been negatively impacted.

Even after *Weeks Marine*, the "substantial chance" test remains the default standard. Indeed, the Federal Circuit repeatedly has held that *even in the pre-award context*, if there is a factual basis for conducting a "substantial chance" analysis, a protester cannot merely allege a "non-trivial competitive injury." In *Orion Technology, Inc. v. United States*, 704 F.3d 1344 (Fed. Cir. 2013), for example, the Federal Circuit applied the "substantial chance" test where the plaintiff submitted a late proposal and omitted material information necessary for the agency's cost realism analysis. *Id.* at 1348. In rejecting the plaintiff's arguments that it was only required to show a "non-trivial competitive injury" given the pre-award context, the Federal Circuit explained that "[i]n *Weeks Marine,* we set out an exception to the general standing test in the case of *pre-bid*, pre-award protests because at that stage it is difficult, if not impossible, to establish a substantial chance of winning the contract prior to the submission of any bids" but that "[g]iven the circumstances, there is an adequate factual predicate to ascertain under the traditional 'substantial chance' standard whether [the plaintiff] was prejudiced by the [agency's] decision to exclude its initial proposal." *Id.* at 1348–49 (emphasis added).

Similarly, *Oracle America, Inc. v. United States*, 975 F.3d 1279 (Fed. Cir. 2020), involved a pre-award protest, and the Federal Circuit rejected the plaintiff's argument that in all such protests a plaintiff need only allege facts showing a non-trivial

---

challenge pre-award (as Weeks has done)." 575 F.3d at 1363. Accordingly, *Weeks Marine* held that a "prospective bidder or offeror must establish 'a non-trivial competitive injury which can be redressed by judicial relief' to meet the standing requirement of § 1491(b)(1)." *Id.* (adopting and quoting the prejudice standard formulated in *WinStar Commc'ns., Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998)).

competitive injury to establish standing.  In rejecting this argument, the Federal Circuit applied *Orion Technology*, explaining:

> In some pre-award cases, we have used the 'non-trivial competitive injury' test "because there is an inadequate factual foundation for performing a 'substantial chance' test." *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013).  In this case, however, there was an adequate factual predicate to apply the "substantial chance" test.

*Oracle*, 975 F.3d at 1291 n.3; *see also Savantage Fin. Servs., Inc. v. United States*, 150 Fed. Cl. 307, 328 (2020) (holding, in pre-award protest, that "this case presents an appropriate factual basis to support the application of the *Oracle* test for showing prejudice because the record is sufficiently developed to . . . demonstrate that [the plaintiff] would [not] have a 'substantial chance' of being awarded the . . . contract").

As discussed in more detail below, the Court will not apply the "non-trivial competitive injury" test outside of the limited factual circumstances where the Federal Circuit has found that it applies.

### D.  Aero Spray Is Not an "Interested Party" with Respect to the Challenged Contract Awards

Aero Spray urges this Court to apply the relaxed, pre-award *Weeks Marine* test here and, accordingly, hold that Aero Spray has standing to have its claims decided on the merits.  Pl. Resp. at 14–16.  Defendant and Defendant-Intervenors, in contrast, argue that, as this is a post-award protest, this Court must apply the traditional post-award "substantial chance" standing test.  Def. MJAR at 36–37; Fletcher MJAR at 27–31; Henry's MJAR at 18–19.  Aero Spray's position is not devoid of merit, particularly given that it relies primarily on a well-reasoned decision of one of this Court's distinguished jurists:  *National Air Cargo Group, Inc. v. United States*, 126 Fed. Cl. 281 (2016) (Lettow, J.) — a decision that gives the Court considerable pause.  Nevertheless, after further consideration, the Court concludes that no matter how it slices the standing inquiry here, Aero Spray is not an interested party, under either Federal Circuit test, with respect to the contract awards made to Defendant-Intervenors.

Before diving into the rationale for that conclusion, the Court must properly frame the standing question.  The "interested party" question focuses on *who* is a proper plaintiff to maintain such an action under § 1491(b).  While the answer to that question may vary based upon the precise nature of the action, the Federal Circuit has never broadened the definition of "interested party" to include a plaintiff in Aero Spray's

position.  In this case, the Court holds that Aero Spray does not allege facts demonstrating:  (1) that it is "an actual or prospective bidder or offeror"; or (2) the type of cognizable prejudice in the procurement process sufficient to constitute an "affected" "direct economic interest."  The parties' debate regarding the *Weeks Marine* test is relevant only to the required prejudice — the "direct economic interest" prong of the "interested party" definition — which, in any case, Aero Spray cannot meet in the factual context of this procurement.

To explain the Court's reasoning, we return, once again, to CICA's definition of "interested party."  CICA defines that term as follows:

> (2) The term "interested party" —
>
> (A) *with respect to a contract* or a solicitation or other request for offers *described in paragraph (1)*, means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract[.]

31 U.S.C. § 3551(2) (emphasis added).  Paragraph (1) of that same statutory provision — referenced in the definition of "interested party" — in turn defines the term "protest" as:

> a written objection by an interested party to any of the following:
>
> (A) A solicitation or other request by a Federal agency for offers for a contract for the procurement of property or services.
>
> (B) The cancellation of such a solicitation or other request.
>
> (C) *An award* or proposed award *of such a contract.*[26]

31 U.S.C. § 3551(1) (emphasis added).

---

[26] Sec. 3551(1) includes two other grounds for objection, neither of which is relevant here:  "[a] termination or cancellation of an award of such a contract, if the written objection contains an allegation that the termination or cancellation is based in whole or in part on improprieties concerning the award of the contract" and "[c]onversion of a function that is being performed by Federal employees to private sector performance.  31 U.S.C. § 3551(1)(D), (E).

Read in context,[27] and considering the entire provision, CICA's definition of "interested party" leads the Court to conclude that Aero Spray does not qualify as an "actual or prospective" offeror and thus lacks standing to challenge the contract awards to Defendant-Intervenors. That is because the statute defines the term "interested party" only "*with respect to a contract* or a solicitation or other request for offers *described in paragraph (1)*." 31 U.S.C. § 3551(2)(A) (emphasis added). That phrase may be easily overlooked but it provides a meaningful textual clue: who (or what) qualifies as an "interested party" depends upon the nature of the "objection." This case, for example, involves neither an objection to a solicitation nor an objection to the cancellation of a solicitation. Rather, the gravamen of Aero Spray's action here involves an objection to "[a]n award . . . of such a [procurement] contract." *Id.* § 3551(1)(C). The question here, thus, is *not* whether Aero Spray is (or, more accurately, *was*) an "an actual . . . offeror" *generally* for the procurement at issue, but rather whether Aero Spray was an actual offeror "with respect to a contract" award that is the subject of the objection. *Id.* § 3551(1)-(2). The Court concludes that Aero Spray, having received a contract award for all that it proposed, was not, and is not, an actual offeror "with respect to" the other contract awards to which Aero Spray now objects.

Because this is not a solicitation-related protest, the term "prospective" is not relevant here, as it applies to a timely solicitation challenge filed before proposals are due. *Weeks Marine,* 575 F.3d at 1361-63 (considering "what is required to prove an economic interest, and thus prejudice, in a case such as this, where a prospective bidder/offeror is challenging a solicitation in the pre-award context" and concluding "that in a pre-award protest such as the one before us, [a] prospective bidder or offeror must establish 'a non-trivial competitive injury which can be redressed by judicial relief'" (quoting *WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998)). Applying the *Weeks Marine* test here — and this is a critical point — would improperly permit a contract awardee to effectively transform itself back into a *prospective* offeror even though all parties now know the results of the procurement. (There are other reasons the *Weeks Marine* prejudice test should not be applied here, and we revisit that issue *infra.*)

The genesis for the interpretative difficulty is easy to understand. In a typical, single award procurement, the resulting agency decision is necessarily a zero-sum game: one offeror becomes a contract awardee at the expense of any other offerors. In such a case, any disappointed offeror is, by definition, an actual offeror with respect to

---

[27] "We do not construe statutes in a vacuum, and 'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Colonial Press Int'l, Inc. v. United States*, 788 F.3d 1350, 1356 (Fed. Cir. 2015) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

the only contract award made.  The same is true even where a solicitation provides for multiple awards, *see* FAR 16.504(c), where the contemplated multiple awards cover different performance scopes or have materially different features (*e.g.*, different geographical regions, services, or funding ceilings).  In that case, a contract awardee may nevertheless be a disappointed, but actual, offeror with respect to the other awarded contracts where such an awardee also sought, but did not receive, the other awards.  That is true whether the disappointed offeror would have preferred a different contract award in lieu of the one received (assuming, of course, that there is a material difference between them) or where the solicitation provided that an actual offeror could receive multiple contract awards (*e.g.*, separate contracts for different regions of the country).[28]

On the other hand, in a multiple award procurement *where an offeror receives the very contract it sought* — *i.e.*, the only contract for which it submitted a proposal — that offeror cannot be considered an "actual offeror" with respect to the other contract awards it did not seek (and, indeed, could not have sought).  Thus, the general rule is that "[o]nce a party becomes an awardee, they are no longer an 'interested party' with standing to bring a bid protest claim under 28 U.S.C. § 1491(b)."  *Looks Great Servs., Inc. v. United States*, 145 Fed. Cl. 324, 328 (2019); *see also TransAtlantic Lines LLC v. United States*, 126 Fed. Cl. 756, 759 (2016) ("[W]here the plaintiff is the awardee of the contract, it no longer has standing under 28 U.S.C. § 1491(b)(1)."); *Kellogg Brown & Root Servs., Inc. v. United States*, 117 Fed. Cl. 764, 769 (2014) *("KBR")* ("[T]he Court agrees with the line of cases holding that when a party brings a challenge in our court to an agency action which affects that party because it is a contractor and not because it is (or might be) an offeror, the only vehicle it may use" is the Contract Disputes Act ("CDA").).

"Although most federal contractors were at one point offerors for the contracts they received, once the contracts are awarded their interests in disputes with the government are those of contractors, not offerors."  *KBR*, 117 Fed. Cl. at 769.  Judge Meyers recently distinguished cases applying that rule as involving "challenge[s] [to]

---

[28] *See, e.g.*, *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 350–51 (2009) (describing solicitation in which an agency sought contractors "in 10 geographic regions and sub-regions" where "[f]or each region, an [IDIQ] contract would be awarded" and where "[p]rospective offerors were permitted to compete for any region" but noting that "the solicitation imposed geographic limitations on the award of multiple contracts"); *UnitedHealth Mil. & Veterans Servs., LLC v. United States*, 132 Fed. Cl. 529, 533 (2017) ("The solicitation explained that [the agency] would select two different prime contractors even if a potential Contractor submits proposals for more than one contract region and each of the proposals is evaluated as the best value for the Government for the contract region of submission. Although [the agency] intended to award two contracts to two different prime contractors, offerors were permitted to submit proposals on one or both regions." (internal quotation marks omitted)).

terms of existing contracts rather than challenging an award decision" but nevertheless found jurisdiction where "Plaintiff-Awardees are specifically alleging error in the Government's evaluation and award decisions *that prevented them from obtaining separate awards.*"  *Sirius Federal, LLC v. United States*, 153 Fed. Cl. 410, 419–420 (2021) (emphasis added) (emphasizing that "there are some significant differences in being awarded a contract as a team lead" as opposed to only "as a team member").  This Court concurs with Judge Meyers, but *Sirius Federal* falls comfortably within the multiple award scenario described above, where a contract awardee may claim it should have won different or additional contract awards.[29]  That is, *Sirius Federal* involved a case where a plaintiff sought to secure a contract award that it did not receive, as opposed to Aero Spray, which does not (and cannot) seek any further contract award.

So, to be clear, the Court in this case does *not* hold that merely labeling a plaintiff an "awardee" is sufficient to conclude that it is not an "interested party" for all purposes.  *Sirius Federal*, 153 Fed. Cl. at 419 (rejecting argument that plaintiffs "automatically lack standing because they are members of [Contractor Teaming Arrangement] Teams that won BPA awards").  Rather, as explained above, the Court must look to the contract award that is the subject of the protest and ask whether the protesting plaintiff is an actual, but disappointed, offeror *for that award*.  In this case, however, Aero Spray received a contract award for all the aircraft services that it proposed.  Nor does Aero Spray allege either:  (1) that the Solicitation contemplates multiple contract awards for the same offeror; or (2) that the government failed to award Aero Spray a contract it should have received.  Accordingly, Aero Spray is not an actual offeror for the other awarded contracts.

The Court further (and separately) concludes, but for similar reasons, that Aero Spray's "*direct* economic interest"[30] is unaffected by the awards to Defendant-Intervenors.  31 U.S.C. § 3551(2)(A) (emphasis added).  If the more permissive APA standing inquiry applied here, the undersigned readily would agree that harm from

---

[29] *See also KBR*, 117 Fed. Cl. at 769 nn.5–6 (noting that "[t]he only exception" to the awardee-lacks-standing rule involves "challenges to certain corrective action" and citing *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1381–82 (Fed. Cir. 2012), for the proposition that "when a proposed corrective action effectively restores an awardee to the status of bidder by requiring it to compete again for a contract award, this action may be challenged by the former awardee in a bid protest").

[30] *See Diaz v. United States*, 853 F.3d 1355, 1359 (Fed. Cir. 2017) (explaining that the "the instant appeal hinges on the second element of the interested party requirement of the standing inquiry" which is "whether Mr. Diaz possessed a direct economic interest" and that "[i]f he does not possess the requisite direct economic interest, Mr. Diaz would not be an interested party and would not have standing to sue").

future, increased competition (for task orders) would constitute a cognizable injury in fact sufficient to support standing (and, significantly, Aero Spray would not have to qualify as an actual offeror).  But, as explained above, that is all legal water under the bridge; the "interested party" standard is more stringent than the APA's standing requirement.[31]

In this case, because Aero Spray has received everything to which it is entitled given its proposal and pursuant to the Solicitation, Aero Spray is not a "disappointed bidder" in any sense of that phrase.  Even if Aero Spray were correct that the awards to Defendant-Intervenors are somehow improper, Aero Spray would not be entitled to any further contract award.  Accordingly, the Court holds that while Aero Spray may have *an* "economic interest" in avoiding future competition, it does not have a "*direct* economic interest . . . affected by the award of *the* contract."  31 U.S.C. § 3551(2) (emphasis added).  *Cf. Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1334 (holding that a "bid protester ha[s] no economic interest in the outcome" where "if the protest were successful, the award would go to another party").

A veritable tsunami of Federal Circuit decisions addressing the meaning of "direct economic interest" in the context of post-award protests supports this Court's holding that Aero Spray lacks interested party status.  The post-award standing test requires that a plaintiff allege facts which, if true, demonstrate that but for the alleged errors in the procurement, the plaintiff would have had a substantial chance of receiving *the challenged contract award at issue*.  *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (holding that, in a post-award protest, a plaintiff "*must* show that there was a 'substantial chance' it would have received *the contract award* but for the alleged error in the procurement process" (emphasis added), *quoted in Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 226 (Fed. Cir. 2019)).  Because Aero Spray has no chance of receiving the other contract awards at issue, Aero Spray lacks a "direct economic interest" necessary for "interested party" standing.  *See, e.g.*, *United States v. Int'l Bus. Machs. Corp.*, 892 F.2d 1006, 1010–11 (Fed. Cir. 1989) (concluding that bid protestor had "at best, a trivial interest in the award" and therefore no economic interest where, if the protest were successful, the award would go to another party); *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996) (providing that the "substantial chance" standard requires the protesting party to "establish not only some significant error in the procurement process, but also that

---

[31] *Validata*, 169 F. Supp. 3d at 79–80 (explaining that "[t]he test for APA standing . . .  requires only that the plaintiff meet the traditional requirements of Article III standing" and demonstrate that the asserted interests are "arguably within the zone of interests to be protected or regulated by the statute" allegedly violated (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 567 U.S. at 224, (2012))).

there was a substantial chance it would have received *the* contract award but for that error" (emphasis added)); *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006) ("To prove a direct economic interest . . . , [the plaintiff] is required to establish that it had a 'substantial chance' of receiving *the* contract." (emphasis added)); *Orion Tech.*, 704 F.3d at 1348 ("Generally, to prove the existence of a direct economic interest, a party must show that it had a 'substantial chance' of winning *the* contract." (emphasis added)); *HVF W., LLC v. United States*, 846 F. App'x 896, 898 (Fed. Cir. 2021) ("To succeed in showing that it had a direct economic interest, [the plaintiff] had to make a sufficient showing that it had a 'substantial chance' of winning *the* contract." (emphasis added) (citing *Eskridge & Assocs. v. United States*, 955 F.3d 1339, 1345 (Fed. Cir. 2020))); *Geiler/Schrudde & Zimmerman v. United States*, 743 F. App'x 974, 977–78 (Fed. Cir. 2018) (holding that "Section 1491(b)'s other jurisdictional requirement confirms the view that alleged legal violations do not occur 'in connection with a procurement or a proposed procurement' whenever they might affect unidentified pending and future procurements" and that "interested party" status requires a plaintiff to "show that it is qualified to receive the contract award"); *Preferred Sys. Sols., Inc. v. United States*, 110 Fed. Cl. 48, 57 (2013) (citing Federal Circuit decisions for the proposition that "[t]o have a 'direct economic interest' means that the plaintiff must show that it had a substantial chance of receiving the contract").

Even the *Weeks Marine* test does not obviate the need for an "interested party" to have a stake in the precise contract to be awarded. For instance, in a hypothetical multi-region, multiple award IDIQ procurement permitting prospective offerors to submit proposals for only a single region, such a prospective offeror could not challenge some aspect of a solicitation's specifications governing only a region for which it has no intention of submitting a proposal. That is not because the would-be plaintiff fails the "actual" offeror test; of course, at that pre-award, pre-proposal submission stage, there are no actual offerors. Rather, in such a case, the would-be plaintiff *is a* prospective offeror — but one who nevertheless fails the "direct economic interest" test because that offeror cannot demonstrate a non-trivial competitive injury *in the procurement itself.*

In other words, the Federal Circuit's *Weeks Marine* decision was concerned not with just any "competitive injury" *resulting* from the procurement, but rather only to the extent the plaintiff would be harmed *within the competition* for the contract it sought. That conclusion may be seen from *Weeks Marine* itself, in which the Federal Circuit adopted the "non-trivial competitive injury" test from *WinStar Communications, Inc. v. United States*, 41 Fed. Cl. 748 (1998), an earlier decision of this Court. *See Weeks Marine*, 575 F.3d at 1361–62 (noting that the trial court "chose to use the *WinStar* standard, where standing is established by alleging 'a non-trivial competitive injury which can be redressed by judicial relief'" and "conclud[ing] that the standard applied by the Court

of Federal Claims in this case strikes the appropriate balance" (quoting *WinStar*, 41 Fed. Cl. at 763)).

In *WinStar*, the plaintiff was a prospective offeror when it filed its protest. 41 Fed. Cl. at 741. Its protest challenged the government's "decision to award only one ID/IQ contract" in violation of "the agency's legal duty to give preference to awarding multiple indefinite delivery/indefinite quantity contracts under a single solicitation to the maximum extent practicable." *Id.* at 750, 754. WinStar also asserted "that the geographic scope of the proposed . . . contract gives the incumbent . . . an unfair competitive advantage" and thus violated the agency's "legal obligation to obtain full and open competition." *Id.* at 750. This Court held that WinStar satisfied applicable standing requirements: "WinStar's direct economic interests would be affected by GSA's failure to award multiple contracts since WinStar, as an offeror, stands a better chance of receiving a contract if multiple awards are made" and because its "economic interests would also be affected by a failure to award contracts for less than the entire proposed . . . area." *Id.* at 756–57 (explaining that "WinStar is more competitive in some areas, such as New York City, and therefore stands a better chance of receiving a contract if the proposed contract area is divided"). In short, because its "competitive position may improve if the challenged solicitation provisions are set aside, WinStar is an interested party with standing to bring this protest." *Id.* at 757.

Clearly, the rationale in *WinStar* was that the plaintiff had "interested party" standing to improve its "competitive position" *within the procurement for the contemplated contract or contracts*. The Court of Federal Claims held precisely that. While the government argued that the agency's decision to award a single contract under the RFP, even if improper, did not entitle WinStar to relief "because it has not been prejudiced[,]" this Court held that "as a result of the single award decision, WinStar has *lost the opportunity to compete* for multiple contracts and its chances of receiving a contract *under the . . . RFP* have been reduced." *Id.* at 762 (emphasis added). Here, Aero Spray's allegations, even if true, do not demonstrate a "reduced" chance of winning a contract under the Solicitation. To the contrary, Aero Spray won the very contract award it sought. Nor, for that matter, did the government impact Aero Spray's *opportunity* to compete — either within the procurement at issue or with respect to future task order competitions under the issued contracts.[32]

---

[32] *Weeks Marine* also favorably cited this Court's decision in *Allied Materials & Equipment Co. v. United States*, 81 Fed. Cl. 448 (2008). *Weeks Marine*, 575 F.3d at 1361-62 (noting that *Allied Materials* "advocat[ed] the *WinStar* standard"). *Allied Materials* may make our point here even more clearly. There, the Court held that it "will find prejudice if plaintiff demonstrates that, absent the error, it would have had a chance of receiving the contract award that is more than merely speculative." *Allied Materials*, 81 Fed. Cl. at 457. The Court explained that such a

Given the Court's textual analysis of the statutory language at issue, as well as the case law analyzed above, the Court agrees with GAO precedent, holding that "an awardee, by definition, is not an actual or prospective offeror" and that "the statutory definition of an interested party expressly bars protests where the protester is the awardee of the challenged contract." *Aegis Def. Servs., LLC*, B-412755, 2016 CPD ¶ 98, 2016 WL 1237962, at *2 & n.5 (Comp. Gen. Mar. 25, 2016) (distinguishing an awardee's challenge to corrective action "because the challenged corrective action essentially returns the procurement to a pre-award status, *i.e.*, the awardee is now akin to a prospective offeror competing for the contract"). The Court further agrees with the GAO that a contract awardee in a multiple award IDIQ procurement cannot demonstrate the requisite "direct economic interest." *See id.* at *3. As the GAO explained, "[d]ue to the nature of IDIQ contracts, . . . an awardee has no legally cognizable expectation of receiving future task orders" but only a "guaranteed a minimum quantity of orders . . . and a fair opportunity to compete for future task orders." *Id.* (discussing FAR 16.505(b)). Thus, while "such economic interest in the issuance of future task orders" may be sufficient under the more lenient APA standing test, such an interest "is too speculative" to constitute a "direct economic interest." *Id.*[33]

In sum, this Court holds that Federal Circuit precedent requires the conclusion that Aero Spray is not an actual or prospective offeror with standing to challenge the awards to other offerors and that it also fails to allege facts to support prejudice for the purposes of standing, whether or not we apply the traditional post-award standing test.

---

standard "takes into account the factual development of the case afforded by the completion (albeit flawed) of the offering process and the actual evaluation of completed proposals." *Id.*

[33] This GAO precedent stretches back decades. *See, e.g.*, *Aegis Def. Servs., LLC*, B-412755, 2016 CPD ¶ 98, 2016 WL 1237962, at *3 (Comp. Gen. Mar. 25, 2016) ("Indeed, [even] if Aegis's protest were found to be meritorious . . . and if CPG's award were terminated . . . , Aegis would be unable to obtain an additional stake in the procurement. Rather, it would remain an awardee with the same guaranteed minimum of $10,000 in task orders and a fair opportunity to compete for future task orders. For this reason, Aegis is not an interested party."); *Recon Optical, Inc.*, B-272239, 96-2 CPD ¶ 21, 1996 WL 399187, at *2 (Comp. Gen. July 17, 1996) ("Since each protester here is a fully successful offeror under the RFP each would be unable to obtain any additional stake in this procurement even if its protest of the other award were sustained. We therefore see no basis to conclude that either protester possesses the requisite direct economic interest necessary to maintain its protest."). Moreover, just like Judge Meyers in *Sirius Federal*, GAO precedent similarly distinguishes between, on the one hand, an awardee seeking a preferred contract award that it was denied and, on the other, an awardee merely seeking to preclude a separate contract award to a potential competitor. *Serv. Connected, Inc.*, B-416324, 2018 CPD ¶ 208, 2018 WL 2932163, at *2 (Comp. Gen. June 11, 2018) (explaining that while GAO "generally does not consider firms that receive one of multiple awards to be interested parties to challenge awards to other firms[,]" a "protester is an interested party [where] it challenges its priority ranking among the BPA holders").

The Court thus concurs with the GAO that "[b]y definition, an IDIQ contract awardee . . . cannot be an actual or prospective offeror with respect to another IDIQ contract awarded under the same solicitation" based on "the simple fact that a contractor that has already been awarded an IDIQ contract cannot be awarded additional IDIQ contracts, even if it could show flaws in the agency's award of those contracts." *AAR Airlift Grp., Inc.*, B-414690, 2017 CPD ¶ 273, 2017 WL 4004517, at \*4 (Comp. Gen. Aug. 22, 2017). Even if Aero Spray "were to successfully challenge the IDIQ awards to [the intervenors,] it would not result in further IDIQ contract awards to" Aero Spray. *Id.*

A straightforward hypothetical further proves the point. The Solicitation and resulting contracts at issue clearly permit the Agency to onboard additional contractors over time. *See* AR 380 (§ C27 ("Onboarding of Contractors After Initial Award(s)"). Specifically, the "Government reserves the right to announce *a new competition* (Onboarding) for the purpose of adding additional multiple award [IDIQ] contract holders." *Id.* (emphasis added). Should the Agency decide to engage in such a new competition, "the CO will publicize a notice by modifying the original solicitation, and complete a new source selection." *Id.* The question is whether Aero Spray would have standing to challenge any aspect of the hypothetical "new competition" (including its results). That answer, in the Court's view, is clearly in the negative; given that Aero Spray already received a contract award for all that it proposed, Aero Spray could not seek yet another award and, thus, could not be a prospective or actual offeror with respect to that new competition. The Court cannot conceive of any reason why there should be a distinction between, on the one hand, a multiple award procurement where all awards are made at the same time, and, on the other hand, a multiple award procurement where the competition takes place, and awards are made, in stages. In both cases, so long as an offeror receives the award for which it submitted a proposal, that offeror lacks standing to challenge other awards (whether made at the same time or in the future); the timing of the awards should make no difference.

Moreover, the fact that the onboarding contract provision, *see* RFP § C27, contains explicit, substantive terms governing the process for additional awards demonstrates that Aero Spray's complaint likely should be in the nature of a CDA claim, similar to the cases Judge Meyers distinguished in *Sirius Federal*, discussed *supra*. *See Sirius Federal*, 153 Fed. Cl. at 420 ("a contractor may not circumvent the CDA by invoking this Court's protest jurisdiction"). In that regard, the onboarding provision is contained within the RFP's Section C ("General Contract Term and Conditions"), AR 369, and thus even if the Agency improperly onboarded additional competitors, Aero Spray's remedy arises from its status as a contractor, which is classic CDA territory.[34]

---

[34] FAR 2.101 (noting that a "[c]ontract clause or 'clause' means a term or condition used in contracts or in both solicitations and contracts, and applying after contract award or both before

*Digital Techs., Inc. v. United States*, 89 Fed. Cl. 711, 730 (2009) (holding that because the Federal Acquisition Streamlining Act ("FASA") of 1994, Pub. L. No. 103-355, § 1004, 108 Stat. 3243, 3252–53 (codified as amended at 10 U.S.C. § 2304c(e) and 41 U.S.C. § 4106(f)), "by its terms, only prohibits task order protests, this court has jurisdiction to hear" contract claims alleging "breach of the fair opportunity provisions of [the] contract").[35]

In sum, and given *AFGE*'s focus on disappointed bidders and its rejection of the broader APA *Scanwell* standing rules, the undersigned agrees with Judge Hertling that "[a]bsent some exception to the Federal Circuit's approach, the Court is bound by *AFGE*'s definition of 'interested party' and subsequent cases interpreting the standing requirement under § 1491(b)." *SEKRI, Inc. v. United States*, 152 Fed. Cl. 742, 751 (2021). This Court will not craft an exception or a new test on its own.

### E. *National Air Cargo*

As noted above, Aero Spray, in an attempt to establish standing here, urges this Court to follow *National Air Cargo Group, Inc. v. United States*, 126 Fed. Cl. 281 (2016). Pl. MJAR at 7–8; Pl. Resp. at 1–7. In that case, after receiving one of the initial five awards under an IDIQ solicitation, the plaintiff-awardee challenged a sixth award on the basis that the agency "violated terms of the solicitation limiting awardees," violated applicable statutes and regulations, and acted irrationally given the sixth awardee's past performance record. *National Air Cargo*, 126 Fed. Cl. at 284. The government moved to dismiss for lack of jurisdiction, challenging the plaintiff's standing pursuant to RCFC 12(b)(1). *Id.* at 284–85. Denying the motion to dismiss, Judge Lettow concluded that the plaintiff's allegation that it suffered a non-trivial competitive injury

---

and after award" while a "[s]olicitation provision or 'provision' means a term or condition used only in solicitations and applying only before contract award"). In this case, the onboarding clause, § C27 (AR 380), applies after award.

[35] *See also* Vernon J. Edwards, *Postscript: Breach of Loss of the Fair Opportunity to Compete*, 20 Nash & Cibinic Rep. ¶ 59 (Dec. 2006) ("Although contractors under multiple award IDIQ contracts cannot protest the award of a task or delivery order, it does not follow that they cannot pursue a claim under the CDA when they think that the Government has breached its promise to give them a fair opportunity to be considered for an order. Protests and claims are very different things in terms of their objectives, the remedies available, and their effect on Government operations."), *quoted in Digital Technologies*, 89 Fed. Cl. at 729; *see also Vanquish Worldwide, LLC v. United States*, 147 Fed. Cl. 390, 398 (2020) (holding that "the Court cannot discern anything in either the language, scheme, or underlying purposes of FASA which suggests that Congress intended to strip this Court of jurisdiction to hear CDA claims for damages that allege the government has violated contractual procedures governing the assignment of task orders"). The RFP in this case contained a contract clause providing for a "fair opportunity" to compete for task orders. AR 375 (§ C15.1.1).

as a result of increased competition due to the sixth award was sufficient to show prejudice and thus qualified plaintiff as an "interested party" with standing. *Id.* at 295. In so holding, Judge Lettow applied the pre-award standing test from *Weeks Marine* because the plaintiff "does not seek a contractual award but instead seeks to remedy an alleged violation of procurement law that has affected the task order pool." *Id.* at 295 (applying "non-trivial competitive injury" test).

This Court is not persuaded to follow *National Air Cargo* for several reasons.[36]

In adopting the relaxed, pre-award *Weeks Marine* standing test for prejudice, the Court in *National Air Cargo* relied primarily upon the Federal Circuit's decision in *Systems Application & Technologies, Inc. v. United States*, in which our appellate court noted that "[a] protest will, by its nature, dictate the necessary factors for a 'direct economic interest.'" 691 F.3d 1374, 1382 (Fed. Cir. 2012). Out of context, this statement suggests a case-by-case assessment regarding the proper prejudice standard for standing purposes. In context, however, this statement is merely a truism; the procedural posture of a bid protest impacts the nature of the requisite prejudice a plaintiff must demonstrate in terms of its "direct economic interest." In that regard, a pre-award solicitation protest is different than a post-award protest:

> A protest will, by its nature, dictate the necessary factors for a "direct economic interest." In pre-award protests, for instance, the plaintiff must show "a non-trivial competitive injury which can be addressed by judicial relief." In post-award protests, the plaintiff must show it had a "substantial chance" of receiving the contract.

*Id.* at 1382 (citations omitted). Indeed, the Federal Circuit in *Systems Application*, while specifically citing *Weeks Marine Inc.*, 575 F.3d at 1361–62, as having "reject[ed] the proposition that the 'substantial chance' requirement applies outside of the postaward context," 691 F.3d at 1382, nowhere intimated the possibility of the converse: that the more relaxed pre-award standard might apply in a post-award protest where an offeror is an awardee with respect to the only contract it sought. In other words, the Federal Circuit has established only a single standing test applicable in a post-award protest,

---

[36] As an initial matter, Aero Spray is flat wrong that a rejection of its position means that "this Court would in fact be overturning *National Air Cargo*." Pl. Supp. Br. at 10. That is because no judge on this court is "bound by other decisions in the Court of Federal Claims[.]" *Buser v. United States*, 85 Fed. Cl. 248, 259 n.12 (2009); *see also Octo Consulting Grp., Inc. v. United States*, 117 Fed. Cl. 334, 361 (2014).

with the cognizable "direct economic interest" depending on whether the plaintiff will have a "substantial chance" at receiving *the contract sought*.

Aero Spray, in contrast, already has won the only contract award to which it could possibly be entitled.  Moreover, nothing in *Weeks Marine* or *Systems Application* demonstrates that the relevant "direct economic interest" may include future competitions for task orders, as opposed to the contract award sought.  Again, as demonstrated above, the "non-trivial competitive injury" is an injury suffered *in the competition for the contract(s)*, not something arising from the award(s).

*National Air Cargo* acknowledged that, in *Systems Application*, the Federal Circuit "found that the case was *factually akin to a pre-award protest* and consequently applied the 'non-trivial competitive injury' test, finding plaintiff would suffer such an injury if it was forced to recompete for a contract it had already won."  126 Fed. Cl. at 293 (emphasis added).  But that reasoning, too, supports the Court's decision *not* to apply the more lenient standard here for the simple reason that we fail to understand how or why Aero Spray's alleged facts and standing theory make its case "akin to a pre-award protest."[37]  Crafting or adopting a different standard to apply in this post-award protest case cuts sharply against the grain of binding precedent.  *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (rejecting plaintiff's argument "that the 'non-trivial competitive injury' standard should apply to this post-proposal, preevaluation protest" because that standard is simply "an exception to the general standing test in the case of pre-bid, pre-award protests").  In *COMINT Systems Corp. v. United States*, the Federal Circuit similarly rejected the plaintiff's argument that "it need only show a 'non-trivial competitive injury' to establish standing" on the basis that "in *Weeks Marine* this court specifically held that the 'non-trivial competitive injury' standard was

---

[37] In *Systems Application*, the Federal Circuit noted that although the "Army had not yet implemented the corrective action" at issue and that the plaintiff "was the contract awardee," "[n]either of these facts are material to the question of jurisdiction."  691 F.3d at 1381.  Again, as explained *supra*, we do not hold that merely labeling a plaintiff an "awardee" provides a *per se*, definitive answer to the "interested party" question.  On the other hand, *Systems Application's holding* does not support Aero Spray's interpretation of "interested party."  It stands, instead, for the proposition that an awardee has standing to challenge an agency's "decision to engage in corrective action [that] will arbitrarily require [the awardee] to win the same award twice." *Id.* at 1382 ("Obtaining a contract award . . . is often a painstaking (and expensive) process.  An arbitrary decision to take corrective action without adequate justification forces a winning contractor to participate in the process a second time and constitutes a competitive injury to that contractor.").  Moreover, in *Systems Application*, "the Army's decision to engage in corrective action [would have] require[d] [the awardee] to re-compete for a contract after its price had been made public." *Id.* at 1383.  The interest SA-Tech sought to protect in its protest was thus in the very award it had sought and had already won but that was threatened by the corrective action.  Aero Spray's interest here in the other contract awards is not comparable.

applicable to 'a *pre-award* protest.'"  700 F.3d 1377, 1383 n.7 (Fed. Cir. 2012) (emphasis in original) (quoting *Weeks Marine,* 575 F.3d at 1363).  Accordingly, the Federal Circuit in *COMINT* held that the relaxed "standard does not apply here *because* Comint's bid protest is a post-award protest."  700 F.3d at 1383 n.7 (emphasis added).

*National Air Cargo*'s approach to the prejudice test for standing is based on the further premise that "not all protestors seek the award of a contract."  126 Fed. Cl. at 292.  In particular, according to *National Air Cargo*, "[m]any protestors do not ultimately seek the award of a contract, but they wish instead to vindicate *some other economic interest*" within this court's jurisdiction.  That is true especially for protests that are pre-award or 'in connection with a procurement.'"  *Id.* at 293 (emphasis added) (discussing *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1288–89 (Fed. Cir. 1999)).  But the applicable definition of "interested party" does *not* include merely a plaintiff with "some other economic interest" in the procurement, 126 Fed. Cl. at 293, but rather includes only an actual or prospective offeror "whose direct economic interest would be affected by the award of the contract" at issue, 31 U.S.C. § 3551(2)(A).  This Court concurs with *National Air Cargo* that a necessary implication of *RAMCOR* is that a plaintiff may have standing to pursue a § 1491(b) action even if that particular action does not itself seek the contract award.[38]  But it does not follow that a plaintiff may qualify as an "interested party" where it is *not* seeking the contract award at all — *i.e.*, either in the procurement generally or in a GAO protest.  In other words, *RAMCOR* addresses ***what*** a § 1491(b) action may include but does not define ***who*** qualifies as "an actual or prospective bidder or offeror" or otherwise meets the remaining elements of an "interested party."

In *RAMCOR*, the plaintiff challenged an agency's override of an automatic stay of the procurement triggered by the timely filing of a GAO protest.  185 F.3d at 1288–89.  At the risk of being repetitive, the question of *who* may file a § 1491(b) action must be distinguished from what type of action an "interested party" may maintain in this Court pursuant to § 1491(b).  In noting that the plaintiff in *RAMCOR* "would not [have] be[en] in line for contract award as a result of its suit," 126 Fed. Cl. at 294, *National Air Cargo* appears to conflate the *who* and *what* questions.  Keeping in mind that the definition of "interested party" was not addressed in *RAMCOR*, this Court infers from

---

[38]  Although "the fourth prong of 28 U.S.C. § 1491(b)(1) constitutes an independent cause of action that is best understood as 'cover[ing] even non-traditional disputes arising from the procurement process as long as the violation is in connection with a procurement or proposed procurement[,]'" that does not necessitate this Court's carving out a new "interested party" test absent Federal Circuit direction to do so.  *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 99 (2020) (internal quotation marks omitted) (discussing *RAMCOR* and quoting *Validata*, 169 F. Supp. 3d at 78).

that case that only an "actual or prospective" offeror *with respect to the contract at issue* may maintain an action under the last prong of § 1491(b).  In *RAMCOR*, the plaintiff was an *actual* offeror — indeed, it was a disappointed bidder in the parlance of *AFGE*, with a protest pending at GAO — "whose direct economic interest would be affected by the award of the contract" at issue.  Because that condition — regarding *who* may file an action — was met, the *RAMCOR* plaintiff had standing to object to an "alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

In contrast, Aero Spray here — as demonstrated above — is not an "actual or prospective" offeror with respect to the contract awards at issue.  This Court thus rejects the contention that a plaintiff "is an 'actual' bidder [just] because, as a matter of fact, it bid on this IDIQ solicitation."  *National Air Cargo*, 126 Fed. Cl. at 295.  *National Air Cargo*'s semantic move is to focus on whether a plaintiff "bid on this IDIQ solicitation." *Id.*  But CICA's definition of "interested party" requires more; it necessitates that the plaintiff be an actual or prospective offeror "with respect to a contract . . . described in paragraph (1)," which, in turn, refers to the contract award that is the subject of the GAO protest or § 1491(b) action.  31 U.S.C. § 3551(1)(C), (2)(A).[39]

---

[39] Another thought experiment is warranted here.  Imagine several disappointed offerors — including an incumbent contractor performing a predecessor contract — file timely GAO protests, challenging an award to a competitor, thereby triggering the automatic CICA stay.  If the government overrides the stay, may the incumbent contractor maintain a *RAMCOR*-type action here at the Court of Federal Claims, even if the GAO dismisses the incumbent contractor's protest because its allegations "fail[ ] to establish that it had a substantial chance of receiving the award, and, therefore, it is not an interested party"?  *Gulf Civilization Gen. Trading & Contracting Co.*, B-419754, 2021 CPD ¶ 208, 2021 WL 2394669, at *6 (Comp. Gen. June 10, 2021).  This Court would definitively answer that hypothetical in the negative because even if the incumbent is harmed by an unlawful override — *i.e.*, the government will start transitioning the incumbent's work to the competitor awardee — the incumbent is no longer an interested party to the underlying contract award at issue and, thus, is not an "interested party" within the meaning of CICA's definition and cannot challenge the override.  According to *National Air Cargo*, however, the incumbent would appear to be an actual offeror merely because it submitted a proposal for the procurement generally and because it "has an economic interest in stopping the government" from proceeding with the transition.  126 Fed. Cl. at 294.  In the undersigned's view, such an outcome is a necessary implication of *National Air Cargo* but cannot be squared with Federal Circuit precedent.  For that reason, the Court agrees with the government that if Aero Spray were correct "that a plaintiff could protest a contract award to another company because the resulting potential increase in competition for follow-on contracts" in the form of task orders "gives the plaintiff a 'direct economic interest' in the competitor's contract award, there is no reason why the Federal Circuit should have prohibited plaintiffs who are 'rated below second' in a procurement from bringing suit."  Def. Resp. at 6–7.  Were such protests allowed, "[a] plaintiff company might easily allege that a contract award

Returning to the "direct economic interest" prong of CICA's "interested party" definition, *National Air Cargo* concluded — contrary to the GAO's position — that an IDIQ contract awardee has a cognizable interest in more than just (a) the minimum award amount necessary to supply consideration in order to form a binding contract, and (b) the opportunity to compete for task orders. 126 Fed. Cl. at 295-96 (holding that "[t]he minimum satisfies the law of consideration, but it does not mean that the IDIQ contractors lack a 'direct economic interest' in the competition for task orders"). Again, this Court concurs with the GAO's approach to this issue. The likelihood of increased competition may constitute an injury in fact for Article III purposes, but it does not follow that Aero Spray's "*direct* economic interest" is impacted by the other awards, particularly in light of the fact that: (1) the government's assessed need was to have "approximately 20–24" aircraft available, AR 10, whereas Aero Spray only offered 15 aircraft, AR 1365; and (2) Aero Spray, as an awardee, is not guaranteed anything more than the mandatory minimum contract amount and the opportunity to compete. *See Interest*, Black's Law Dictionary (11th ed. 2019) (defining "direct interest" as "[a] certain, absolute interest"). The Court concludes that Aero Spray's "certain, absolute interest" is only in its own contract award, which does not include a guaranteed level of competition. *See* Pl. MJAR at 26 (Aero Spray's concession that it "will not *directly* be deprived of the opportunity to compete for task orders" (emphasis added)).

Finally, Aero Spray relies on two subsequent decisions from this Court, *PAE-Parsons Global Logistics Services., LLC v. United States*, 145 Fed. Cl. 194 (2019), and *Sirius Federal, LLC v. United States*, 153 Fed. Cl. 410 (2021), for the proposition that an awardee of a multiple IDIQ contract has standing to challenge other contract awards. Pl. Resp. at 6–7. Aero Spray's reliance on these case misses the mark. As explained above, this type of case involves a post-award challenge in which a contract awardee was found to have standing to protest that it had a "substantial chance" of being awarded a more valuable contract; those cases did *not* involve a challenge based merely on increased competition in future task order competitions. *See, e.g., PAE-Parsons*, 145 Fed. Cl. at 199–200 (where government concurrently awarded four "very different" IDIQ contracts, the court concluded that because the protestor was awarded a lower priority IDIQ contract, the plaintiff "clearly has standing as a disappointed bidder with regard to the IDIQ contract award at issue in this case").[40] These decisions certainly do not demonstrate that this

---

will confer some significant competitive advantage on a competitor company so that even if the plaintiff were ineligible for award, it should have standing to challenge an award to its direct competitors" as unlawful. *Id.* at 7. Of course, "the Federal Circuit has repeatedly held that such a protest is impermissible," *id.*, foreclosing Aero Spray's argument.

[40] Similarly, *Glenn Defense Marine (Asia) PTE, Ltd. v. United States,* 97 Fed. Cl. 311 (2011), *appeal on other grounds dismissed as moot after government settled with plaintiff*, 469 F. App'x. 865 (Fed. Cir. 2012) — another case upon which *National Air Cargo* relies at some length — involved a

Court routinely has applied anything other than the "substantial chance" standard in the post-award context or exempted the plaintiff from being an actual offeror for the contract award being challenged.  To the extent *National Air Cargo* has crafted such an exemption, it effectively applied APA standing rules, something this Court will not do.

* * * *

For the reasons explained above, this Court holds Aero Spray lacks standing and that its pending complaint thus should be dismissed pursuant to RCFC 12(b)(1).

## III.   AERO SPRAY'S PROTEST IS UNTIMELY PURSUANT TO THE FEDERAL CIRCUIT'S *BLUE & GOLD* DECISION

The government argues, and the Court agrees, that "[g]iven the confluence of ambiguous language and provisions, the question of whether an actual weighing of each aircraft proposed, in contract configuration, was required *at the time of proposal submission* was patently ambiguous" such that if Aero Spray "was concerned that a competitor would be able to submit a proposal without including such a weight and balance report, it was required to raise this issue prior to submitting its bid, and cannot do so now."  Def. MJAR at 36 (emphasis added) (citing *Blue & Gold*, 492 F.3d at 1313); *see also* Def. Resp. at 13–14.  Accordingly, even if Aero Spray has standing, its protest is untimely.

Practitioners before this Court (and government contractors of any experience) are, at this point, very familiar with the requirement that a prospective offeror must

---

challenge to the government's award of multiple contracts where the plaintiff alleged that "the solicitation required one IDIQ contract award."  *National Air Cargo*, 126 Fed. Cl. at 296 (citing *Glenn Def.*, 97 Fed. Cl. at 317 n.3).  *Glenn Defense* is distinguishable, however, because the plaintiff, there, clearly sought a greater scope of work than it was awarded (services supporting two ports in the Philippines for the Navy, rather than four such ports for which the plaintiff submitted a proposal).  97 Fed. Cl. at 318–23.  Here, in contrast, Aero Spray does not dispute it received all that it was entitled to receive per its proposal.  More significantly, in *Glenn Defense*, Judge Allegra not only noted that "[t]o demonstrate prejudice, the protestor must show that there was a substantial chance it would have received the contract award but for that error[,]" but also specifically held that the plaintiff satisfied a version of the Federal Circuit's "but for" post-award standing test:  "Cases construing this second variation on the prejudice inquiry [for standing] have held that it requires merely a 'viable allegation of agency wrong doing,' with 'viability turning on the reasonableness of the *likelihood of prevailing on the prospective bid* taking the protestor's allegations as true.'"  *Glenn Def.*, 97 Fed. Cl. at 317 & n.3 (first quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (internal quotation marks omitted), and then quoting *McKing Consulting Corp. v. United States*, 78 Fed. Cl. 715, 721 (2007) (emphasis added)).

challenge patent solicitation ambiguities in a timely manner or be barred from relying upon a preferred solicitation interpretation in a later, post-award bid protest.  *See, e.g.,* *VS2, LLC v. United States*, -- Fed. Cl. --, 2021 WL 4167380, at *8–*13 (Sept. 1, 2021).  As discussed at length in *VS2*, the Federal Circuit held in *Blue & Gold* "that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action" in this Court." 492 F.3d at 1313; *see also VS2*, 2021 WL 4167380, at *8. This "waiver rule" is "rooted (albeit somewhat loosely) in the statutory text providing this Court with jurisdiction to decide procurement-related actions[.]"  *VS2*, 2021 WL 4167380, at *8 (discussing 28 U.S.C. § 1491(b)(3)'s "mandate[] that 'the courts shall give due regard to the interests of national defense and national security and *the need for expeditious resolution of the action*'" and explaining that "[r]ecognition of a waiver rule, which requires that a party object to solicitation terms during the bidding process, furthers this statutory mandate" (quoting § 1491(b)(3))); *see also Inserso Corp. v. United States*, 961 F.3d 1343, 1352 (Fed. Cir. 2020) (holding that because plaintiff waited until after the award to challenge it, plaintiff "forfeited its right" to do so, and that bidders "exercising reasonable and customary care" were on notice of the alleged defect "long before" award).  "A waiver rule thus prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation." *Blue & Gold*, 492 F.3d at 1314.  The Federal Circuit went on to conclude that "the same reasons underlying application of the patent ambiguity doctrine against parties to a government contract speak to recognizing a waiver rule against parties challenging the terms of a government solicitation."  *Id.*

The central thrust of Aero Spray's amended complaint is that "[t]he Agency's decision to award IDIQ contracts to Fletcher Flying and Henry's Aerial despite neither company having an aircraft ready to perform on the contract as required by the Solicitation is arbitrary, capricious, and an abuse of discretion."  Am. Compl. ¶ 36; *see also* Am. Compl. ¶ 42 ("Nowhere in the Solicitation does the Solicitation allow aircraft to be proposed . . . that could potentially be prepared to perform on contract . . . .").  According to Aero Spray's reading of the Solicitation, it "clearly . . . does not imagine the acceptance of aircraft 'anticipated' to be complete at some arbitrary date after award" and, thus, "[t]he only reasonable interpretation of the Solicitation is one that required aircraft to be configured, weighed, certified, and able to perform on the contract by the submission of the proposals, *not* May 2021."  *Id.* ¶¶ 45-46.

The Court disagrees.

At least one offeror during the procurement process clearly identified an ambiguity in the Solicitation because a question was asked regarding precisely *what* information had to be included in the proposal and *by when* the proposed aircraft had to

be ready.  In particular, Question 26 asked whether "a vendor [may] include an aircraft in its offer that will not be delivered to that vendor in Fire Boss configuration until after the solicitation closes?"  AR 127.  That same question further inquired whether "it [would] be acceptable for the vendor to base its empty weight and payload calculations on an aircraft in wheel configuration with estimates on what the Fire Boss will weigh" after it is fully configured.  *Id.*  The Agency's terse response did not answer the question; it indicated only "See Questions 2 & 3."  *Id.*

Unfortunately, the Agency's answers to Question 2 and Question 3 shed little to no light on the ambiguity that Question 26 sought to clarify.  The very premise of Question 2 was that the offeror would not have two Fire Boss aircraft complete "by the submission date for the Solicitation."  AR 122.  The Offeror wanted to know *how* it "should . . . handle listing the aircraft[.]"  *Id.*  The Agency's answer did not say that such aircraft could not be proposed.  Rather, the Agency's answer refers simply to "*proposed* aircraft."  *Id.* (emphasis added).  Further, the Agency instructed that "[t]he proposal must include at least one aircraft that meets the minimum requirements of the solicitation."  *Id.*  This bare-bones instruction provides neither temporal parameters nor direction about "listing the aircraft"; nothing in it, therefore, is inconsistent with the government's view that the aircraft need not be ready by the time of proposal submission.  In other words, the answer to Question 2 does not clearly address either of the inquires posed in Question 26.

Question 3 similarly appears designed to get at the same or similar ambiguity as Question 26.  In that regard, Question 3 asked the Agency to clarify whether "[f]or a Contractor to offer an aircraft in response to this solicitation, does the aircraft need to be in operational Fire Boss contract configuration, including an acceptable Weight & Balance (in accordance with Section B32) and Equipment List that would allow the Aircraft Questionnaire to be filled out?"  AR 122–23.  The Agency's answer to that question all but restates the response to Question 2:  "A proposal must include at least one aircraft that meets the minimum requirements of Section A1, and all related requirements and documentation as stated in the solicitation . . . ."  AR 123.  Once again, in response to Question 3, the government neither provided guidance on whether *any* proposed aircraft had to be in operational configuration *at the time of proposal submission*, nor clarified whether providing estimated data would be acceptable.

In short, Question 26 was never answered, clearly or otherwise.  The result is that the Solicitation was patently ambiguous.  *See Quanterion Sols., Inc. v. United States*, 152 Fed. Cl. 434, 445 (2021) ("An ambiguity in an RFP is generally patent if offerors seek clarification of the ambiguous provision prior to submitting their proposals." (citing *Per*

*Aarsleff A/S v. United States*, 829 F.3d 1303, 1312–13 (Fed. Cir. 2016))).[41]  When a Solicitation is patently ambiguous, the government remains free to select a reasonable interpretation, as it sees fit, during the evaluation and award segments of the procurement process.  *See Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 998 (Fed. Cir. 1996) ("If a solicitation contains contract language that is patently ambiguous, a protestor cannot argue . . . that its interpretation is proper unless the protestor sought clarification of the language from the agency before the end of the procurement process."); *NVY Technologies, Inc. v. United States*, 370 F.3d 1153, 1162 (Fed. Cir. 2004) ("If an ambiguity is obvious and a bidder fails to inquire with regard to the provision, his interpretation will fail."); *Wackenhut Servs., Inc.*, B-276012, 98-2 CPD ¶ 75, 1998 WL 650258, at *3 (Comp. Gen. Sept. 1, 1998) ("[A]n offeror who chooses to compete under a patently ambiguous solicitation does so at its own peril, and cannot later complain when the agency proceeds in a way inconsistent with one of the possible interpretations.").  Here, the Agency effectively adopted an interpretation that Aero Spray does not prefer, but it is too late to complain about that now.  *Blue & Gold*, 492 F.3d at 1315 (holding that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so *prior to the close of the bidding process* waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims" (emphasis added)).

In any event, as Henry's Aerial points out, offerors were required to submit with their respective proposals an "Aircraft Information Form."  AR 429 (RFP Exhibit E-3) (instructing offerors to "reproduce and submit [a copy] for each aircraft offered").  That form, in turn, required offerors to calculate a "*proposed* aircraft payload" to include the "[w]eight of Equipment *to be added*" to the proposed aircraft, defined as the "[e]quipment *to be added* to meet the requirements of this contract."  *Id.* (emphasis added).  Relatedly, the form permits offerors to note "Empty Weight in current configuration plus and/or minus equipment *to be added or removed* for contract compliance."  *Id.* (emphasis added).  Based upon that form's language, Henry's Aerial persuasively argues that the Agency clearly intended to permit merely "a projection of what you're going to add."  Tr. 67:20-22.[42]  There is little or no textual indication in the

---

[41] *Per Aarsleff*, in turn, held that an "ambiguity in the solicitation was patent, as reflected in the questions received by the Air Force and the two plausible interpretations" the court summarized.  829 F.3d at 1312–13.  In that case, "[f]ollowing clarification during the question-and-answer period, the ambiguity was removed, and so there was at that time neither a patent nor a latent ambiguity."  *Id.*  In this case, in contrast, the Solicitation's ambiguity was never removed.

[42] Tr. 67:20 — 68:5. (THE COURT: Oh, so you're saying this [form] shows that it's a projection of what you're going to add.  MR. SMITH: Correct.  THE COURT: That's a good point.  MR. SMITH: And it goes on to say, . . . [']Computed Empty Weight in Contract Configuration. Empty weight in current configuration plus and/or minus equipment to be added or removed

RFP, even as supplemented with the Q&As, that offerors were required to use actual values — as opposed to proposed or projected equipment "to be added or removed" in the future — for any proposed airplanes or, as Aero Spray contends, for at least one such airplane.  To the extent there is any such indication, the Court cannot reconcile all of the various textual references to extract a clear meaning in the manner Aero Spay advocates.  The Solicitation is patently ambiguous even following the Q&As, if not because of them.

Accordingly, in the alternative, the Court holds that Aero Spray's pending complaint should be dismissed as untimely pursuant to RCFC 12(b)(6).[43]

## IV. EVEN IF AERO SPRAY'S CLAIMS HAD MERIT, THIS COURT WOULD REJECT ITS REQUEST FOR INJUNCTIVE RELIEF

Even if Aero Spray had standing and its claims were timely pursuant to *Blue & Gold* — and even if this Court reached the merits and decided the case in favor of Aero Spray — this Court nevertheless would reject Aero Spray's request for permanent injunctive relief.

The Tucker Act vests this Court to award "any relief that the court considers proper, including . . . injunctive relief . . . ."  28 U.S.C. § 1491(b)(2); *see* RCFC 65.  In evaluating whether permanent injunctive relief is warranted in a particular case, a court must consider:  (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff has shown irreparable harm without the issuance of the injunction; (3) whether the balance of the harms favors the award of injunctive relief; and (4) whether the injunction serves the public interest.  *PGBA v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).

Assuming for the sake of argument that Aero Spray could meet the threshold requirement for permanent injunctive relief — *i.e.*, succeeding on the merits of its claims — the Court finds that:  (1) Aero Spray will not suffer irreparable harm in the absence of an injunction; and (2) the balance of harms easily tips in favor of the government.

First, the Court notes that Aero Spray did not seek a preliminary injunction or secure an agreed-upon stay of the challenged contract awards, suggesting a lack of

---

for contract compliance.[']  This information is useless if every aircraft — if you have to propose an aircraft that is already in contract configuration.").

[43] This Court considers a failure to meet the *Blue & Gold* waiver rule under RCFC 12(b)(6), rather than under RCFC 12(b)(1).  *SEKRI*, 152 Fed. Cl. at 752 (holding that "the *Blue & Gold Fleet* waiver rule is not jurisdictional and thereby more appropriately addressed under RCFC 12(b)(6)" because the Federal Circuit, in *Blue & Gold*, "did not establish the waiver rule as a limit on jurisdiction"); *VS2, LLC v. United States*, -- Fed. Cl. --, 2021 WL 4167380, at *11 (Sept. 1, 2021).

irreparable harm. *PGBA*, 389 F.3d at 1229, 1232 (affirming the denial of injunctive relief where the trial court "considered PGBA's failure to seek a preliminary injunction as a factor weighing against a grant of injunctive relief").

Second, although a plaintiff offeror may demonstrate irreparable harm where a solicitation improperly impairs the offeror's ability to compete for the contract at issue or where an agency's decision improperly costs a disappointed offeror the contract it sought, the only putative injury here is that arising from the possibility of future increased competition for task orders.[44]  Accordingly, the Court agrees with the government that "even assuming that [such] economic harm can be considered irreparable harm . . . , such harm pales in comparison to the risk to DOI's firefighting capabilities and the nation's woodlands that the United States would suffer in the event of a permanent injunction."  Def. Resp. at 16.  In that regard, the government, via a declaration of the cognizant contracting officer, provides support for this Court's finding that the government has a present need for all of the aircraft services for which

---

[44] Aero Spray's briefs and oral argument were sprinkled with the assertion of an additional harm:  "In order to actually comply with the solicitation, [Aero Spray] was required to expend funds that the awardees did not.  They were able to push off to some nebulous date in the future the cost of converting their aircraft into Fire Boss aircraft. As a result, they gained a competitive advantage over [Aero Spray]."  Pl. MJAR at 26; *see also* Tr. 15:2–16:20 (Aero Spray arguing injury in the form of "impact on cost" and "competing against other offerors . . . that didn't meet the requirements of the solicitation").  The Court does not understand this argument because no party disputes that airplanes cannot be provided by any contractor unless and until they meet contract specifications and regulatory flight requirements.  Aero Spray does not explain — and points to no evidence in the record demonstrating — how Defendant-Intervenors' decision to propose fewer aircraft that were not yet ready at the time of proposal submission either (1) impacted Aero Spray's decision to propose 15 aircraft that were ready for use, or (2) will impact its competitiveness for task orders. Tr. 15:2–16:16.  Moreover, the RFP (and resulting contracts) provide that "Contractors' pricing for task orders shall not exceed the prices in the IDIQ price schedule" and that "[d]iscounted pricing is permitted."  AR 375 (RFP § C15.1.1).  Accordingly, Aero Spray is free to lower its pricing in task order competitions. Tr. 19:6–8 (Aero Spray agreeing that proposed "prices are ceiling prices" and that contractors are "free to discount" from those ceiling prices).  Again, to the extent another awardee now has an aircraft ready to compete — and presumably had to incur costs just as Aero Spray did — Aero Spray does not explain why the resulting competition is unfair just because Aero Spray had its airplanes ready earlier. *Cf. MLS-Multinational Logistic Servs., Ltd v. United States*, 143 Fed. Cl. 341, 374 (2019) (noting "that the price submitted by [the plaintiff] in response to the Solicitation when competing for a contract was a maximum, not a fixed amount, for the potential, future task orders" and "[t]herefore, even if [the plaintiff]did not submit its lowest bid to receive a contract in response to the Solicitation because of its uncertainty with the Port Tariff provisions before the proposals were due, given the clear direction from the Navy that it would not make any changes to the Port Tariff provisions at this time, [the plaintiff]could now price that certainty in its offer when submitting bids for future task orders").

the Agency already has contracted — that is, including those the Defendant-Intervenors offered.  *Id.* at 16–18 (discussing Def. Resp. Ex. A ¶¶ 5–7).  The Court finds the contracting officer's explanation persuasive and agrees that enjoining the awards to Henry's Aerial and Fletcher Flying would reduce the Agency's retained fleet and "increase[] the danger not only to the national woodlands" but also to "firefighting personnel on the ground who would be aided by these additional airborne firefighting assets."  Def. Resp. at 17 (citing Def. Resp. Ex. A ¶ 6).[45]

Third, contrary to Aero Spray's argument, the Court agrees with the government that the contract awards to Henry's Aerial and Fletcher Flying are not "guaranteed portions of the contract[,] which harms the total value of [Aero Spray's] award."  Def. Resp. at 17 (quoting Pl. MJAR at 26).  The government is correct that "there is no minimum dollar value guarantee for any IDIQ awardee" in the procurement at issue, but rather "the only economic benefit guaranteed by the IDIQ award is listed at [RFP] Section A2.2."  Def. Resp. at 17.  That RFP section provides that the minimum guarantee to awardees would be "aircraft, equipment, and pilot inspection during the Base year."  AR 339 (RFP § A2.2 ("Minimum Guarantee/Maximum Quantity")).  Thus, "[t]he inclusion of additional IDIQ awardees does not reduce the 'guaranteed portions of the contract' one iota."  Def. Resp. at 18.

Finally, Aero Spray's request for permanent injunctive relief is fatally undermined by the following critical admission (in its motion for judgment on the administrative record, addressing the "balance of hardships"):

> Once the Disputed Awardees have Fire Boss aircraft capable of performing the contract, the Solicitation has a method to publish Solicitations for additional awards and those offerors can submit offers at that point.  That is what the terms of the Solicitation allow for . . . .

Pl. MJAR at 27.  This concession, of course, means that Aero Spray, in any event:  (1) could not stop the Agency from adding additional contractors (in line with the Court's

---

[45] The Court's consideration of such extra-record evidence is appropriate when evaluating prejudice or the propriety of injunctive relief.  *See, e.g., State of N. Carolina Bus. Enters. Program v. United States*, 110 Fed. Cl. 354, 365 (2013) ("[I]t is proper to admit an affidavit to show prejudice — even though it is not proper to show error."); *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 366–67 (2009) ("In general, it is appropriate to add evidence pertaining to prejudice and the factors governing injunctive relief to the record in a bid protest — not as a supplement to the AR, but as part of this Court's record."); *Pinnacle Sols., Inc. v. United States*, 137 Fed. Cl. 118, 131 (2018) ("the government need not seek to supplement the administrative record with documents that address the injunctive relief factors").

hypothetical, *see supra* Section II.D); and (2) even assuming the Defendant-Intervenors should not have received initial contract awards — a question this Court does not reach — any harm to Aero Spray would be highly limited in duration.  Indeed, with respect to the latter point, Aero Spray does not contest that both Fletcher Flying and Henry's Aerial have since readied at least two aircraft each, in compliance with the Solicitation. ECF No. 43 ¶¶ 3–4; ECF No. 45.[46]  At this point in time, then — and given Aero Spray's admission about the Agency's available contractual method for adding contractors — there would be little point to enjoining the awards to Defendant-Intervenors or for remanding this matter to the Agency to add awardees.[47]

In sum, this Court would deny Aero Spray's request for injunctive relief even if the Court had ruled for Aero Spray on the merits of its pending complaint.

## CONCLUSION

For all the above reasons, the Court **GRANTS** Defendant's and Defendant-Intervenors' motions to dismiss pursuant to RCFC 12(b)(1) and, in the alternative, pursuant to RCFC 12(b)(6); the Court **DENIES** Aero Spray's motion for judgment on the administrative record.  Additionally, the Court **DENIES** the pending motions to supplement the administrative record as **MOOT**.  Accordingly, the Clerk is directed to enter **JUDGMENT** for Defendant and Defendant-Intervenors, dismissing this case.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge

---

[46] Because the Court does not reach the merits of Aero Spray's claims, the Court concludes that the pending motions to supplement the administrative record are moot.  Nevertheless, the Court considers the additional documentation the parties provided, but only in terms of the remaining injunctive relief factors addressed in this section of the Court's decision.

[47] Although the Court repeats that it does not reach the merits of Aero Spray's claims, Aero Spray's prejudice case is all but fundamentally undermined by its admission regarding the onboarding process.  The mere fact that the government may add contractors (and their aircraft) — and has determined a present need for them — means that Aero Spray cannot demonstrate that it would have remained free from additional competition at this point in the performance of its IDIQ contract.  *See* Henry's MJAR at 20 (correctly highlighting, in the Court's view, that Aero Spray's claimed injury is "narrow[ed] . . . to competing for task orders with contractors who did not have planes in contract configuration at some arbitrary, [Aero Spray]-selected time before the post-award inspection necessary" or "even smaller than that" to the extent it would suffer such an injury only "until BLM solicits new proposals" and awards new contracts).